54 CCPA

### Application of David G. BRAITHWAITE.
### Patent Appeal No. 7800.

United States Court of Customs and Patent Appeals.

June 15, 1967.

Rehearing Denied Oct. 5, 1967.

---

Marzall, Johnston, Cook & Root, Richard L. Johnston, Herbert B. Keil, Chicago, Ill., for appellant.

Joseph Schimmel, Washington, D. C. (Joseph F. Nakamura, Washington, D. C., of counsel), for the Commissioner of Patents.

Before WORLEY, Chief Judge, RICH, SMITH and ALMOND, Judges, and WILLIAM H. KIRKPATRICK.*

RICH, Judge.

This appeal is from the decision of the Patent Office Board of Appeals, adhered to on rehearing, affirming the rejection of claims 1–17 of application serial No. 93,361, filed March 6, 1961, for "Manufacture of Organic Lead Compounds." No claim is allowed.

The sole ground of rejection is "double patenting" in view of the claims of appellant's Patent No. 3,007,858[1] issued November 7, 1961, on application serial No. 811,262 of which the application on appeal is a continuation-in-part. In further support of the rejection the following prior art reference is relied on:

Calingaert et al. 2,535,193 Dec. 26, 1950

Following appeal to the board and the filing of the examiner's Answer, Nalco Chemical Company, assignee of the application at bar, filed a terminal disclaimer under 35 U.S.C. § 253, disclaiming the terminal part of the term of any patent granted on the application which would extend beyond November 7, 1978, the expiration date of Braithwaite patent 3,007,858. Thereafter the examiner filed a Supplemental Answer stating that he had considered our decisions in In re Robeson, 331 F.2d 610, 51 CCPA 1271, and In re Kaye, 332 F.2d 816, 51 CCPA 1465, both of which were decided after the date of the examiner's original Answer,[2] and holding the terminal disclaimer ineffective to avoid the double patenting rejection. He said the claims here on appeal were not of the type involved in Robeson and Kaye but were mere "colorable variations" of the patent claims and cited in support of his rejection In re Siu, 222 F.2d 267, 42 CCPA 864. The board sustained the examiner's position. We reverse.

The inventions of the patent and the application relate to the manufacture of organic lead compounds. Braithwaite's patent 3,007,858 relates primarily to the manufacture of tetraethyl lead, the familiar "Ethyl" antiknock compound used in motor fuels, by a new electrolytic process. Neither the disclosure nor claims of the patent, however, are limited to making tetraethyl lead. The disclosure is that the invention is a process for making "organo metallic compounds." The disclosure of the "organo" portion or radical (R in the formula, infra) includes "methyl, ethyl, propyl,

* Senior District Judge, Eastern District of Pennsylvania, sitting by designation.

1. This patent issued to Nalco Chemical Company, Chicago, Illinois. Appellant, David G. Braithwaite, assignor, is president of that company and has also assigned the application on appeal to Nalco.

2. Apparently the sequence of events was something like this: The examiner filed his Answer April 8, 1964, our Robeson and Kaye opinions were published May 25 and June 22, appellant filed a supplemental response (not of record) October 9 probably calling attention to these decisions, executed the terminal disclaimer December 29 and filed it January 4, 1965, the examiner filing his Supplemental Answer February 5. The board decided the case April 28, 1965.

isopropyl, butyl and higher homologues, phenyl, benzyl, and the like." The disclosure of the metallic component (M in the formula), while primarily lead, is broadened by the statement that "the metal M in equation C can be another metal which is capable of being electrolyzed in a Grignard reagent. Examples of such other metals are calcium, zinc, cadmium, manganese, mercury, lanthanum, thallium, arsenic, bismuth, tellurium and selenium." Equation "C" is the basic reaction formula for the electrolytic process of the invention and is:

$$\text{C.} \quad 4RMgX + M^{++++} \underset{\leftarrow}{\rightarrow} M(R)_4 + 2\,MgX_2 + Mg$$

$$\text{D.} \qquad\qquad RX + Mg \;\rightarrow\; RMgX$$

Formula "D" is a simultaneous reaction, the combining of the free magnesium produced with added organic halide as hereinafter explained. A Grignard reagent, as is well known, has the basic formula $RMgX$, the first item in the above equation "C" and the last item in "D", wherein R is an organic radical, Mg is the metal magnesium, and X a halogen, such as chlorine, bromine, or iodine. It will be observed that if M is lead and X is chlorine, then the first-named product $M(R)_4$ is tetraethyl lead, which is produced along with magnesium chloride $MgX_2$ and some metallic magnesium.

Some further background of the patented process is relevant to the legal problem under discussion. Prior to Braithwaite's patented invention it appears that tetraethyl and related lead compounds, which enjoy a market of some $270,000,000 or more a year, were made by purely chemical processes. The differentiating characteristic of Braithwaite's process is that it is an electrolytic process, having certain advantages we need not discuss. The gist of it is that a Grignard reagent is placed in solution in an organic solvent containing a pair of electrodes to which current is applied. At least the anode, in the case of making organo lead compounds, is made of lead and lead or a variety of other conductors can be used for the cathode. The lead anode is referred to as a "sacrificial anode" as it is consumed, the metal combining with organic radicals from the Grignard reagent upon electrolysis. The Mg radicals which are simultaneously freed from said reagent would normally cause problems by depositing on the cathode or bridging the electrodes and, to eliminate these problems, one aspect of the invention is to add to the solution another organic halide, referred to by Braithwaite as "extraneous" halide to distinguish it from the organic halide needed to form Grignard reagent. This added organic halide combines with the free magnesium and reconverts it to a Grignard reagent as shown in formula "D", avoiding magnesium deposit on the cathode and possible bridging of the electrodes. Example: ethyl magnesium chloride, which is a Grignard reagent, is dissolved in dibutyl ether of diethylene glycol. Ethyl chloride is added to the solution and current is passed between a steel cathode and a lead anode therein. Tetraethyl lead forms in the solution from the combining of the ethyl radicals from the Grignard reagent with the lead anode. Removal of the product from the solution is by conventional techniques forming no part of the invention.

Note that in the above example *both* the Grignard reagent and the extraneous organic halide are *ethyl* compounds. This exemplifies the principal difference between what is said to be the invention of the patent and the invention of the appealed application. In the patent it is stated that the invention utilizes an extraneous organic halide "the organic radical of which *corresponds* to the organic radical of the Grignard reagent being used." (Emphasis ours.) For example, the organic radical in each is

ethyl. All of the examples of the patent disclose the same pair of ethyl compounds. In the application, as hereinafter explained, the organic radicals *differ*.

The difficulties of this case would appear to arise from two facts: not all of the patent claims are limited to using Grignard reagent and extraneous organic compound with *corresponding* organic radicals and the specification contains certain broadening statements. To illustrate the first fact: Claims 3, 4, 5, and 6 of the patent specify a process for making tetra*ethyl* lead utilizing *ethyl* magnesium chloride and extraneous *ethyl* chloride. However, claims 1, 2, 7, and 8, all the remaining claims, are more generic with respect to the organic radical, using the term "alkyl" (which describes ethyl broadly) or referring to the Grignard reagent broadly without specifying what the R of RMgX is. Patent claim 1 is typical of these broader claims:

1. A process for preparing *alkyl* lead compounds which comprises electrolyzing, using a lead anode, a substantially anhydrous solution of *a Grignard reagent* in a substantially inert organic solvent for said Grignard reagent employing an electrolyzing current effective to cause said lead anode *to dissolve in said solution* of said Grignard reagent in said organic solvent, adding an excess of an *alkyl* halide over that required for the formation of the Grignard reagent, and recovering from the resultant product an *alkyl* lead compound consisting of *alkyl* radicals linked directly to metallic lead. [Emphasis added.]

From reading that claim it will be evident that both the Grignard reagent and the added alkyl halide could contain different, rather than corresponding, alkyl

radicals, ethyl and methyl for example. Therefore, the claims so worded would be infringed by and so would cover a process, or dominate a patent on a process, using such a pair of *differing* "alkyl" compounds.

The second significant fact creating difficulties in this case is that such a claim construction would find support in certain broadening statements in the patent specification. We have already quoted above the statement about how the "organo" portion of the organo metallic compound (Grignard reagent) may be one of several kinds. Another significant statement is this: "The halogen portion of the added organic halide does not have to be the same as the halogen portion of the Grignard reagent." This follows the statement that "In accordance with the invention" the organic radicals *do correspond*. The passage principally relied on by the Patent Office follows a description of several different Grignard reagents which may be used, in which the organic radicals are ethyl, isoproply, butyl, amyl, and phenyl, and states that mixtures of them may be used "to produce other organic lead compounds * * * containing the phenyl radical or both the phenyl and ethyl radicals or both phenyl and other alkyl radicals * * *." This is about all the patent contains with respect to forming lead compounds having different organic radicals attached to the lead atoms. In other words, it briefly indicates the possibility.[3] There is no specific disclosure of how to make such compounds. Four of the eight claims are of such scope as to cover the process of making them, broadly.

The application on appeal is a continuation-in-part and adds a great amount of detail with respect to the making of lead compounds in which different organic lead compounds are attached to the

3. With respect to a matter of practice, we fail to note any reference in the patent to the instant application though it was filed many months before the patent issued. Though Patent Office Rule 79 is somewhat discouraging with respect to such a notice, it is at least permissive and it would seem the better part of wisdom, to say the least, and very helpful to attorneys, if it were to be indicated that subject matter disclosed is being claimed in another application, suitably identified.

lead. We shall now describe briefly the nature of this disclosure. Basically the same electrolytic process for making "organic lead" compounds is described, the metal in this case being specified to be lead in the specification and in all claims. The invention is stated to be particularly for "the manufacture of organic lead compounds containing two different hydrocarbon radicals linked directly to metallic lead." The object of the invention is stated to be "a new and improved process for preparing compounds in which different organic radicals are linked to metallic lead." The opening paragraph of the description reads:

> In accordance with the present invention a substantially anhydrous solution of a Grignard reagent in an organic solvent for the Grignard reagent is electrolyzed, using a lead anode, and adding extraneous organic halide to the electrolyte, *subject to the condition that the electrolyzing action is carried out in the presence of at least two different organic radicals which react with the lead.* [Emphasis ours.]

There follows extensive, detailed description and sixteen specific examples of the making of such compounds which are not to be found in the patent disclosure and which, if a patent is granted, surely would contribute considerable knowledge to the art not to be gleaned from the patent.

The appealed claims fall into two groups. Claims 1–10 are directed to process and claims 11–17 to an electrolyte. Claims 1 and 11 exemplify them (emphasis ours):

> 1. A process for preparing organic lead compounds containing *different* organic radicals linked to the same metallic lead atom which comprises electrolyzing, using a lead anode, a substantially anhydrous solution of at least one Grignard reagent in a substantially inert solvent for said Grignard reagent, and adding at least one extraneous organic halide to said solution, the organic radical of at least one said organic halide being *differ-*

*ent* from the organic radical of at least one said Grignard reagent.

> 11. An electrolyte for making organic lead compounds comprising a substantially anhydrous solution of at least one Grignard reagent in a substantially inert solvent for said Grignard reagent and at least one extraneous organic halide, and the organic radical of at least one said Grignard reagent being *different* from the organic radical of at least one said organic halide, the total concentration of extraneous organic halides being within the range of 0.1 to 1.1 moles per mole of total Grignard reagent.

All of the claims either specify different organic radicals or different alkyl radicals, or name specifically organic radicals which are different.

It may, therefore, be accurately stated that the appealed claims are to processes of a specific nature not *specifically* claimed in the patent, albeit some of the claims therein may be sufficiently broad in scope to provide patent coverage for what is here claimed, assuming the validity of such broad claims. Naturally, the appealed claims, in general being narrower than such broad claims in the patent, are less vulnerable to attacks on their validity than the broad patent claims.

The claims to electrolyte compositions are, of course, to subject matter not claimed in the patent at all, though putting the electrolytes to use would result in processes which would be covered. They are nevertheless claims of quite different commercial significance to a possible vendor of electrolyte solutions.

The question before us, then, is whether, by taking out the patent, Braithwaite has estopped himself from obtaining these added and narrower claims to specific aspects of his electrolytic process for making organic lead compounds and electrolytes used therein, on the basis of a greatly amplified disclosure of something merely foreshadowed by general observations in his patent disclosure.

The question has been narrowed by the filing of the terminal disclaimer to inquiry into whether he can have these claims in a patent which would expire at the same time as his already issued patent.

The above-described situation can be summarized as follows. In the application which eventuated in his patent, Braithwaite described his basic process for making tetraethyl lead by an electrolytic process, characterizing his process more broadly, however, by reference to "organo metallic" compounds, "organic halides" added to the bath, and by suggesting certain instances in which the organic radicals attached to lead might be different. In each of his five patent examples his Grignard reagent and his extraneous organic halide are both ethyl compounds and the product is tetraethyl lead. He says at least twice that according to his invention the organic radicals of the two bath ingredients "correspond." In four of his eight claims they do correspond and are, specifically, both ethyl. In the other four claims broader language is used in that the term "alkyl" replaces "ethyl," whereby the claims become broad enough to read on a process in which the organic radicals do not correspond, though no claim says they do not or that they differ. While the parent application was still pending and eight months before the patent issued, the application at bar was filed containing a full and detailed description of processes not described in the original application, not having as their objects the production of tetraethyl lead but of different lead compounds wherein, instead of four ethyl or other *like* organic radicals attached to lead, *unlike* or *different* organic radicals are attached to the lead atoms, giving products such as those described as resulting from the new specific examples. In Example I a methyl Grignard reagent is used with extraneous tertiary butyl chloride and it is stated that "The lead product containing both methyl and tertiary butyl radicals linked directly to metallic lead is recovered by removal of the solvent."

In Example IX is the statement, "The product is a mixture of organic lead compounds, including tetraethyl lead, tetramethyl lead, triethylmethyl lead, diethyldimethyl lead and trimethylethyl lead." Example XII says "The product is a mixture of organic lead compounds containing methyl, ethyl and tertiary butyl radicals linked to metallic lead." At the conclusion of the examples is a summary of the various ways of carrying out this invention "either by employing two or more organic halides with a single Grignard reagent or by employing two or more organic halides with a mixed Grignard reagent or by employing a single organic halide with a mixed Grignard reagent." It concludes, "In any case, products are obtained containing at least two different organic radicals linked to metallic lead." This invention, whether claimed as process or as electrolyte, is not described in the original application with the fullness contemplated by 35 U.S.C. § 112. It is only hinted at in the broadening statements above referred to which would seem to have had the disclosure of the present application in mind as a future possibility.

The rejection before us was thus stated by the examiner in his original Answer, to which he adhered and with which the board agreed:

It is the examiner's contention that the present claims do not define a separate and independent invention over the claims of the patent to Braithwaite. Claim 1 of the patent calls for electrolyzing an electrolyte comprising a Grignard reagent and an alkyl halide. As evident from the last paragraph of col. 4 et seq. (Rule 75(d)) the "Grignard reagent" and "alkyl halide" of the patented claims may be mixed to produce a mixed organic lead compound. The mixed Grignard reagent and the corresponding organic halides would provide at least one different organic radical in the electrolyte.

The examiner further contends that it would be within the skill of the art

to apply the teaching of Calingaert et al. to an electrolytic process as apparent from the patented claims. * * *

* * * * * *

Claims 11–18 [17] embrace the electrolytes that may be used in the process. While the argument above is directed to such claims, it is considered that the proportions of components or reactants claimed are not critical but merely preferred amounts. In any event it is within the skill of the art to determine optimum or operable proportions.

Calingaert et al. disclose purely chemical (non-electrolytic) processes for making alkyl lead compounds including such as tetraethyl lead wherein all alkyl radicals attached to the lead are the same and compounds in which they are different. Little more need be said about it considering the use made of this reference by the Patent Office and the view we take of the case.

■ The rejection is on the ground of "double patenting," the Braithwaite patent is not prior art and Calingaert is. We regard this as an obviousness-type [4] double patenting situation, that is, the rejection is on the ground that the difference between what is claimed here and what is claimed in the patent to Braithwaite is only such a difference or modification as would be obvious to those of ordinary skill in the art in view of the prior art. Appellant contests the Patent Office position on obviousness on the ground that electrolytic process behavior cannot be predicated on the basis of purely chemical reactions, citing Ex parte Wilson, 71 USPQ 276 (1946) in which the board said, with respect to a process for electroplating copper,

It is not determinable before-hand in these electrolytic processes what may result from combining different re-

agents or active materials. The action may be regarded as more obscure than simple or pure chemical reactions, due to the presence of electrolytic effect.

While this may be so, the starting point here is Braithwaite's patented process for making tetraethyl lead in which there are two "alkyl" radical sources in his electrolytic bath, the Grignard and the extraneous reagents. Knowing that when they are both ethyl compounds they produce tetraethyl lead, we do not think we have sufficient factual basis for holding there was error in the examiner's view that Calingaert et al. would make it obvious that use as one of the alkyl compounds of a methyl compound, for example, would reasonably be expected to produce mixed organic radicals attached to the lead. We therefore proceed on the basis that the appealed claims are to processes and electrolytes not differing from what is claimed in the patent in an unobvious manner. In the absence of a terminal disclaimer, this would lead to an affirmance. In re Simmons, 312 F.2d 821, 50 CCPA 990. But, unlike Simmons, a terminal disclaimer was filed in this case, which brings us to a consideration of its effect.

■ We dealt thoughtfully with this situation in Robeson and Kaye, supra. The examiner and the board refused to apply those cases on the ground it would amount to an "extension" of their holdings due to factual differences. The examiner felt the claims here differ only "colorably" from the patent claims, with which we disagree; and the board relied on the fact that here the patent claims are "generic" and "embrace" what is here claimed, whereas in Robeson and Kaye the claims were mutually exclusive. We do not see what difference this makes. It is said by the solicitor that due to this generic aspect the claims of the patent and the application "overlap." We do not see what difference

4. While analogous to the non-obviousness requirement of 35 U.S.C. § 103, that section is not itself involved in double patent-ing rejections because the patent principally underlying the rejection is not prior art.

that makes either.[5] When a terminal disclaimer causes two patents to expire together, a situation is created which is tantamount for all practical purposes to having all the claims in one patent. It is common for a single patent to contain overlapping—i. e. generic and specific—claims. We have previously indicated that generic and specific claims, though by definition they "overlap," may be considered as "distinct" in the double patenting context. In re Sarett, 327 F.2d 1005, 51 CCPA 1180.

■ Double patenting is a basis of rejection grounded in public policy and primarily intended to prevent prolongation of monopoly. The present case is an example. With the aid of a sketchy forecast in the patent specification of things to come, Braithwaite was able to obtain claims which cover what he is now claiming in this application. Assuming validity of the broad patent claims, he has been enjoying patent protection which would be continued beyond the expiration of his patent, by allowance of the appealed claims, on subject matter which does not differ from the subject matter of that patent in an unobvious, that is to say "patentable" way. But by his terminal disclaimer he has foreclosed the possibility of such an extension of protection.

■ Looking at the other side of the picture, it appears to us to have been to the advantage of the public—rather than to himself—that Braithwaite has followed the course above described. By taking out his patent and filing continuation-in-part applications (there is another in appeal No. 7801 decided concurrently), he accelerated the disclosure contained in his patent and hastened the date of expiration of his protection as therein afforded. By his terminal disclaimer he has hastened as well termination of protection from any claims he may get as a result of this appeal. Furthermore, he has added considerable dis-

closure of technology, over what is in his patent, by the additional matter contained in the continuation-in-part applications and supporting the claims presented therein. Assuming dominating claims in his patent, all he is getting from this application—and for only the remainder of the same term—are additional, more specific claims which would serve as a second line of defense if the dominating claims should prove to be vulnerable. To affirm in this case would principally serve to deprive the public of the knowledge contained in the added disclosures. We can perceive no sound reason for deciding this obviousness-type double patenting case differently from Robeson or Kaye.

The Patent Office has relied on In re Siu, supra. We have reexamined it and consider it distinguishable for reasons explained in Robeson. There is more than one invention involved here. The single mechanical fiber-producing process involved in Siu did not become a different process by merely naming the specific material, glass, operated on. Chemical processes involving different reagents and producing different products are different processes constituting *different* inventions even if they are not patentably distinct.

The decision of the board is reversed.

Reversed.

WORLEY, C. J., and KIRKPATRICK, J., did not participate.

SMITH, Judge (concurring).

The record shows that the Board of Appeals here consisted of an examiner-in-chief and two acting examiners-in-chief. Appellants do not challenge the legality of that board. For the reasons expressed in my dissenting opinion in In re Wiechert, 370 F.2d 927, 54 CCPA 957, it is my view that the decision of such a board is a legal nullity. However, I accept here the majority's view

5. We are not unaware of the January 9, 1967, Commissioner's notice, 834 OG 1615, entitled "Double Patenting," but it has not been relied on in this case. We are aware that it is inconsistent with this opinion with respect to overlapping claims of a single inventive entity.

on this issue in the *Wiechert* case, that is, the legality of the board is not an issue here. I therefore participate in the merits of this appeal and in so doing, agree with the conclusion of the majority.

Turning to the merits of this appeal, a few additional observations further support the conclusion reached by the majority.

The "law" of "double patenting" is indeed confusing.[1] One factor frequently overlooked, present in *all* "double patenting" cases involving the *same* inventor, is that as between the subject matter in the claims sought to be patented and those teachings which are "prior art" under the 1952 Patent Act, the subject matter is useful, novel and *unobvious* in view of that "prior art." In other words, the inventor has made a "patentable invention" under the conditions specified in sections 102 and 103.

The term "double patenting" is not mentioned in the 1952 Patent Act.[2] It is a judicially created doctrine which acts to deny applicants patents. Its very existence would appear to be contrary to statements in previous opinions of this court, as stated in In re Murray, 268 F.2d 226, 46 CCPA 905, for

&ast; &ast; &ast; an applicant is entitled to a patent unless one of the prohibitory provisions of the statutes, now the Patent Act of 1952, Title 35 U.S.C., applies.

See also In re Ratti, 270 F.2d 810, 46 CCPA 976; In re Cavallito, 282 F.2d 363, 48 CCPA 720; and In re Gustafson, 331 F.2d 905, 51 CCPA 1358.

To date this court has not discarded "double patenting" as a ground of rejection (as we did "aggregation" in In re

Gustafson, supra). Instead, our efforts have attempted to harmonize the various "principles" of the "law" of "double patenting" with the mandatory provision of the Patent Act that "A person *shall* be entitled to a patent unless" a stated ground of rejection applies. Thus we have held that section 101 contains the prohibition that an applicant is only entitled to "*a* patent" for *an* invention. Here I refer to the "same invention" type of "double patenting": See In re Robeson, 331 F.2d 610, 51 CCPA 1271. By so proceeding we have endeavored to accommodate the various "types" of "double patenting" *situations* that have appeared before us *and* give effect to the provisions of the Patent Act. See In re Bowers, 359 F.2d 886, 53 CCPA 1590; In re Robeson, supra.

While we have been able to identify the "same invention" type "double patenting" with a statutory provision, such is not the case with "obviousness" type "double patenting." It stands as a judicially created doctrine and certainly not bottomed on section 103. See In re Zickendraht, 319 F.2d 225, 229, 50 CCPA 1529, concurring opinion, Rich, J. The patent is simply not "prior art" under the terms of section 103. *If* section 103 were applicable then obviously there would be no need for this type of "double patenting."

It seems to me that "obviousness" type "double patenting" rests upon a judicially recognized policy that an inventor may not claim subject matter that is obvious from that previously claimed *because* of the possibility of an "extension of the monopoly" (patent protection) concerning the previously claimed subject matter.[3] Under section 154, the inventor is entitled only to exclude others

---

1. See Rich, The Proposed Patent Legislation: Some Comments, 35 Geo.Wash.L. Rev. 641, 646–47 (1967); Bullinger, "Double Patenting" and the 1952 Patent Act, 10 IDEA 389 (1966).

2. It is well known, however, that sections 121 and 253 were intended, in part, as *remedial* provisions applicable in certain "double patenting" situations.

3. I am not concerned with the title or theory of this policy, e. g., estoppel, dedication, etc. Nor do I here refer to unobvious subject matter which, if patented, patent protection would "overlap" the protection for previously claimed subject matter. This has never been contrary to patent law.

from making, using, or selling the invention throughout the United States for the term of seventeen years.

Recognizing that the doctrine of "double patenting" is judicially created and, further, that objections based on "double patenting" may be "unavoidable," In re Robeson, supra, it seems to me that the "obviousness" type should be applied to the ends of preventing any "extension of monopoly" *and* doing justice to applicants. The substantive principles of sections 101 and 154, of course, may not be compromised. The remedial provisions of sections 121 and 253, however, do not represent a compromise. Thus whether "obviousness" type "double patenting" does in fact exist becomes nothing more than a needless mental exercise in cases where, as here, there can be no "extension of monopoly" because of the remedial provisions of the Patent .Act.

Accordingly, our present view is that a terminal disclaimer will not overcome a rejection based on the objection that the applicant seeks to claim the "same invention"—here meaning same subject matter—and it will overcome a rejection based on the objection that the applicant seeks to claim a "different invention"—here meaning "different subject matter"—which is "obvious" in view of the earlier claimed subject matter either considered *alone* or in *combination* with "prior art." [4]

It may indeed be confusing to some to learn that a terminal disclaimer removes any objection to the "obviousness" of the invention in "double patenting" situations but will not remove an objection to "obviousness" under section 103. Cf. Hays v. Brenner, 123 U.S.App.D.C. 96, 357 F.2d 287 (1966). Commissioner Brenner has stated, in an address delivered to the Patent Professional Staff of the Patent Office on March 30, 1966 (825 O.G. 825):

> * * * if the examiner is satisfied that the claimed invention is clearly obvious in view of the teachings of the prior art, to a person having ordinary skill in the pertinent art, then a patent should not be granted even if affidavits, terminal disclaimers, and the like are presented by the applicant, *since such papers cannot change what is obvious so it may become unobvious and therefore a patentable invention.* [Emphasis added.] 825 O.G. at 827.

Referring only to the Commissioner's comments as to terminal disclaimers, a case of "obviousness" type "double patenting" *is based on teachings which cannot be considered under section 103*. See In re Bowers, 359 F.2d 891, fn. 7. That which is "obvious" in a "double patenting" sense may *not* be obvious under the terms of section 103 simply because *less* information is available under section 103 when the patent is *not* a proper reference and may not be considered.[5]

The plain fact here is that the patent relied on for the rejection is *not* "prior art" under the Patent Act and resort to section 103 is prohibited under the present view of the law.[6] Thus the claimed

---

4. There is no place in Patent Law for the use of the term "invention" as a requisite of patentability. Older cases to that effect should be ignored. Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966) ; In re Walles, 366 F.2d 786, 54 CCPA 710. The Commissioner's comments as to affidavits, infra in text, are contrary to *Graham* as *all* the relevant *facts* must be considered, pro and con, not just one side.

5. Under section 103, the patent may not be considered but in "double patenting" situations, the *claims* may be considered in view of the "prior art." Conversely,

the inquiry permitted under "double patenting" is *narrower* as compared to the inquiry permitted under section 103 when the patent *is* a proper reference. In re Bowers, 359 F.2d at 891, fn. 7. It seems to me that the statutes are mandatory and must be applied, and there should be no resort to "double patenting" when the patent is a proper reference. See In re Ornitz, 376 F.2d 330, 54 CCPA ——.

6. I refer here of course to the same inventorship. Where the inventorship is different, the Patent Office should proceed under sections 102(e) and 103. In

invention is *not obvious* in view of the "prior art," section 103. It seems to me that to refuse to give effect to a terminal disclaimer to overcome a "double patenting" rejection based on "obviousness" is *contrary* to the 1952 Patent Act. Congress has provided for terminal disclaimers and we must act accordingly.

In the present case the Patent Office argues that the "double patenting" situation before us involves "overlapping" claims and the terminal disclaimer fails to "overcome the double patenting rejection." I fail to see, and the Patent Office has not explained, how this alleged fact somehow operates to prevent the consequences inuring from the filing of a terminal disclaimer, section 253. Clearly the terminal disclaimer eliminates the basis for the objection, i. e., "extension of monopoly." As appellant here claims different subject matter than is claimed in his prior patent there can be no objection based on section 101. In re Walles, supra. Because of the terminal disclaimer, there can be no "extension of monopoly." [7]

The Patent Office has failed to state a single reason why the terminal disclaimer is ineffective other than that the claims "overlap." While In re Siu, 222 F.2d 267, 42 CCPA 864, is relied on

by the Patent Office as authority for this position, I find nothing in that decision *or* opinion which is contrary to the result reached here. Moreover *Siu* is not a viable precedent in the "law" of "double patenting" as in my view the subject matter relied on in the Ladisch patent was "prior art" under sections 102(e), 103, and 120. A review of the record in that case shows that there were *different inventors* (Ladisch and Siu) and *no common assignee* (the U. S. Government had a royalty free license in both cases) when Siu's application was rejected by the examiner.[8] The examiner made no "double patenting" rejection. Instead, he relied on Siu's admission that he *derived* the process from Ladisch and *subsequently* applied it to molten glass. In the examiner's view, Ladisch's teachings were "prior art" as to Siu.[9] See In re LoPresti, 333 F.2d 932, 52 CCPA 755. The first reference to "double patenting" by the Patent Office was in the board's opinion. The opinion of this court expressly points out "the Ladisch patent, which issued on an earlier filed application [sic], may be *properly cited as a reference*[10] against appellant's instant application," 222 F.2d at 270, 42 CCPA at 868. [Emphasis added.] In short, I do not be-

---

re Ornitz, 376 F.2d 330, 54 CCPA ——. See In re Land, 368 F.2d 866, 880, at fn. 12, 54 CCPA 806. Moreover, where these latter sections are *applicable*, a terminal disclaimer cannot overcome a rejection *based on those sections*. A terminal disclaimer overcomes only certain objections based on *"double patenting."*

7. No "abuse" of the terminal disclaimer has been suggested. See In re Robeson, supra. See also supra fn. 1, "Evils of Double Patenting," 10 IDEA at 397 (1966).

8. Certain agreements were entered into by Ladisch and Siu with Texiclon Corp. after an appeal had been taken, Ladisch executed an "Assignment" and Siu executed an "Agreement." See Ex parte Hein, 114 USPQ 175 (Bd.App.1955).

9. Ladisch and Siu were co-workers. According to the record in *Siu* both inventors originally considered that they were *joint* inventors of the whole subject

matter. Subsequently they were advised by patent attorneys that they were not joint inventors and that the subject matter was divisible. Separate individual applications were then filed, each of which identified and described the other's invention and presented claims only to their respective contributions. See In re Land, 368 F.2d 872 supra fn. 3.

10. Sections 102(e), 103 and 120. The order of the respective applications is as follows:
 1. 4–26–49, No. 89,776 (L & S jointly)
 2. 8–15–49, No. 110,371 (L)
 3. 8–15–49, No. 110,372 (L).
 4. 8–16–49, No. 110,663 (S) ("Parent")
 5. 10–19–49, No. 122,343 (L)
 6. 8–21–50, No. 180,686 (S) (CIP of 4, application on appeal)
 7. 10–23–50, No. 191,672 (L) (CIP of 1, 2, 3, and 5, Ladisch patent).
See discussion supra fn. 6, and accompanying text.

lieve either that a "double patenting" rejection was made or could have been made in *Siu* (no common assignee); or that this court there affirmed a "double patenting" rejection.

The problem in *Siu* appears to stem from appellant's reliance on a terminal disclaimer. Appellant argued before the Office that the following "novel issue" should be decided, *after* the board appeared to reject the claims on the basis of "double patenting": [11]

> * * * whether a patent [Ladisch] under *common ownership*,[12] which was *copending* with a pending application filed for a different species [glass] in the name of a *different member* [Siu] of the same research team [Ladisch & Siu] and containing claims overlapping with the patent [dominated by, within the scope of the patent claims], can be *removed as a reference* against the pending application *by means of a timely disclaimer* in the pending application, under the last provision of section 253 of the Patent Act of 1952, of that terminal portion of the term of the patent to be granted on the still pending application which would extend beyond the expiration date of the patent already granted; i. e., where the grant of patent on the application for the second species would NOT *extend the monopoly* conferred on the common owner by the generic claims of the patent already issued * * *. [Emphasis added.]

Before this court Siu argued there was no "double patenting" rejection. Apparently he also wondered whether the recently enacted provision as to terminal disclaimer could be used to *remove prior art subject matter* thus circumventing sections 102(e), 103 and 120. With this background information, the statement that Ladisch was *properly cited as a reference*, In re LoPresti, in the opinion in *Siu* takes on its true importance. What was said in *Bowers*, supra, that a terminal disclaimer cannot remove subject matter in the prior art, was decided some 11 years earlier in *Siu*. Furthermore, the examiner correctly applied section 102(e) in *not* relying on Ladisch's description of *Siu's* invention. See In re Land, supra. Remarks in the *Siu* opinion as to the effect of a terminal disclaimer should be considered in relation to the only issue properly before the court, arising under sections 102(e), 103, and 120. Any statements in *Siu* relating to "double patenting" and terminal disclaimers inconsistent with *Kaye* and *Robeson* have long been overruled.

The issue presented by Siu, quoted supra, and his arguments were recently presented in In re Fong, PA 7786, decided concurrently herewith. The problems faced by common assignees arising from the fact that groups rather than individuals often make inventions are for Congress. See In re Fong.

I therefore would reverse the decision of the Patent Office for the reason that its rejection is not based on a statutory ground of rejection *and* its action is contrary to section 253. See In re Robeson, 331 F.2d at 614, 615, fns. 4 and 10, 51 CCPA at 1274, 1276. Manifestly, when sections 101 and 103 are satisfied, a judicially created doctrine should not be permitted to operate to negate the remedial provisions of section 253.[13]

---

11. See infra fn. 12. The apparent confusion of the board probably stems from its erroneous impression that the examiner rejected Siu's *claims* over the subject matter *claimed* in Ladisch. See In re Ornitz, supra, especially appellant's arguments therein. Compare the arguments of appellants in *Hays* with those made in *Siu*.

12. Apparently Siu was willing to assume, for purposes of argument, that the royalty-free license in the government was tantamount to "common ownership."

13. It seems to me that the examiner, when he believes that an "obviousness" type situation is present, should inform the applicant that the claims will not be allowed in the absence of a terminal disclaimer because to do so would result in an extension of patent protection contrary to section 154.