**VANITY FAIR MILLS, INC.,**
**Plaintiff,**

v.

**OLGA COMPANY (INC.),**
**Defendant.**

**No. 67 Civ. 4181.**

United States District Court,
S. D. New York.

Jan. 8, 1974.

Willis H. Taylor, Jr., Philip T. Shannon, Pennie, Edmonds, Morton, Taylor & Adams, New York City, for plaintiff.

Stuart A. White, Nicholas L. Coch, White & Coch, New York City, Louis J. Bachand, Jr., Los Angeles, Cal., for defendant.

## OPINION

GRIESA, District Judge.

This a patent infringement case involving two patents on women's panty briefs. The patents, Nos. 3,142,300 ("300") and 3,142,301 ("301"), were issued to Olga Erteszek, the inventor, on July 28, 1964. Mrs. Erteszek assigned the patents to the defendant, Olga Company (Inc.) ("Olga"), a company of which she was co-founder. Olga has since 1963 marketed a brief embodying the patents.

Plaintiff Vanity Fair Mills Inc. is, like Olga, a manufacturer of women's undergarments and lingerie. Between 1967 and 1969 Vanity Fair's line includ-

ed a brief (Vanity Fair style number 40–28) which is accused in this action of infringing the Olga patents.

Vanity Fair seeks a judgment declaring that the Olga patents are invalid and that, in any event, Vanity Fair·has not infringed the patents. Olga, in its answer to the complaint, denies that its patents are invalid and counterclaims for damages and for alleged infringement.

### Facts

*Description of Garments*

There are three basic types of garments in the girdle family. The first is the girdle proper, or "skirt girdle," which is made up of an elastic member encircling the abdomen and hips. The second is the "panty girdle," which includes a closed crotch and leg extensions. The third type is the "brief" or "panty brief," which is a panty girdle without legs—*i. e.*, basically containing only the elastic encircling member and a crotch piece. All three types of garments have been made since the 1930's or early 1940's. The Erteszek patents in suit relate to the third type—the brief.

Of the three types of garments, the girdle generally provides the most figure control. However, it has at least one disadvantage—the need for garters to prevent it from "riding up" as the wearer changes position. This problem presents difficulties in connection with short skirts, pants and certain athletic costumes. Hence the resort to panty girdles and briefs.

Despite the advantages of the panty brief in affording maximum freedom, etc., this type of garment has presented two problems. The first is how to obtain enough flattening of the abdomen. The second is discomfort resulting from binding in the crotch and around the legs. The evidence indicates that there were various efforts over the years to solve these problems, none of which was entirely successful.

For instance, Mrs. Erteszek designed and marketed a brief in the late 1940's and 1950's which attempted, in a manner not entirely clear, to provide sufficient stomach control and avoid binding in the legs and crotch. The garment apparently did not achieve the desired results.

In 1954 Gossard introduced a type of brief designed to ease the leg and crotch binding (Peck Design Patent 174,054). The Gossard garment is illustrated in Figure 1.

### FIGURE 1

In the Gossard brief the leg was cut quite high, and around the leg opening there was sewn a rather wide strip of elastic of a much softer quality—having less "kick"—than the elastic material in the body of the garment. As stated in a Gossard advertisement:

> "You need never again hear the old pantie complaint, 'it binds my legs.' Gossard's new pantie is so radically different that *legs can't feel it.* And this pantie really *controls* the figure · · · ." (emphasis in original)

The record does not show the extent to which this garment was or was not successful. Despite the fact that Gossard termed its garment "radically different" it was basically the same in design as the earlier briefs, except that its leg openings were made of a softer fabric.

In 1955 Maidenform put on the market a garment described as a "combina-

tion garter-belt and panty-brief" (Rosenthal Patent 2,763,008). But this garment (illustrated in Figure 2) required garters and was not a brief in the true sense of the word. It was not commercially successful.

**FIGURE 2**

*The New Erteszek Designs*

In 1962 Mrs. Erteszek worked out a design of a brief which represented a substantial change in construction from prior models of this type of garment. The design is shown in Figure 3. This is the design, involved in the 301 patent.

The Erteszek 301 brief is made up basically of two constituent members. The first member is a torso-encircling elastic body which serves the purposes of a girdle. The second member consists of a separate piece of fabric which is cut and sewn in such a way as to constitute a panel which overlays the girdle member in the front, and then extends down under the crotch and is attached to the girdle member at the back.

The panel-crotch member is stitched down the front to the points marked in Figure 3 with "X". The panel-crotch member is *not* stitched to the girdle member at any point below points "X" until it has passed under the crotch and

meets the back of the girdle member at points "Z", where it is sewn to the girdle member. Consequently at the points "Y"—which mark the intersection of the bottom of the girdle member with the panel-crotch member—the two members are separate and independent.

**FIGURE 3**

As Figure 3 shows, the leg openings are made up of the bottom edge of the girdle member (passing around the outsides of the legs) and the panel-crotch member (passing around the insides of the legs). The unique feature of the 301 design is that the leg openings are able to adjust naturally as the position of the wearer changes. This results from the fact that in the area of points "Y" in Figure 3 the girdle member and the panel-crotch member can move independently of each other.

The purpose of this design is to alleviate the crotch and leg discomfort which were problems in prior designs of briefs. In addition, the panel in the Erteszek 301 design affords additional stomach control. There is apparently enough of an inward pull exerted by the panel-crotch member to give some appreciable assistance to the stomach flattening effect of the girdle member.

Prior to marketing her new model of brief, Mrs. Erteszek found it necessary to make one modification in the 301 gar-

ment. In testing the 301 brief, Mrs. Erteszek discovered that, while the independence of the girdle and panel-crotch members at points "Y" enhanced the comfort of the garment, there was an offsetting disadvantage in that the border of the girdle member in this area tended to ride up.

In order to solve this problem, Mrs. Erteszek added a piece of loose tricot material inside the original crotch piece and connecting the bottom of the front of the girdle member with the crotch piece. The garment with this modification is involved in the 300 patent and is illustrated in Figure 4.

FIGURE 4

The tricot piece is sewn to the girdle member at "XX" and to the crotch piece at "YY". The intent is to have the tricot piece be loose enough to permit the adjustment of the leg openings as in the 301 garment, while at the same time preventing the girdle member from riding up.

*The Patent Applications*

a. *The 301 Patent*

The application for the 301 patent was filed on November 20, 1962. On August 12, 1963 the Examiner rejected all six claims in the application as unpatentable over Rosenthal Patent No. 2,763,008 and one other prior patent.

The Rosenthal relates to the Maidenform garter-belt and pantie-brief described above. As indicated in Figure 2 the Rosenthal design involves a torso encircling member with a "panel" running *inside* that member, running down under the crotch. The Examiner, in rejecting the Olga application, stated that the differences between the Olga and Rosenthal designs (principally involved in Olga's having the panel run *outside* the girdle member) were merely changes "within the normal skills of the art."

Following the August 12, 1963 rejection by an Examiner, Claim 1 was amended. On November 7, 1963 the Examiner rejected all claims in the application on the ground that they were indefinite and incomplete, indicating that the application did not define with sufficient precision the functions of the components of the garment.

A further amendment was made to Claim 1. On December 10, 1963 the Examiner rejected all six claims, again comparing the Erteszek design with the Rosenthal patent, and stating:

"The inclusion of 'a front panel . . . overlying the front of the body' involves merely a simple expedient of choice. This would be an obvious reversal of arrangements. No new nor unobvious result or advantage is seen in disposing the front panel upon the front body portion. The recitation of a curved edge portion and elastic fabric in the crotch portion represent no more than the skillful arrangement of elements well known in this crowded art. These features are those which would flow naturally from the teachings of the prior art within the capabilities of one of ordinary skill in the art of body supports."

On January 20, 1964 counsel for Mrs. Erteszek interviewed the Examiner and displayed sample garments based on the Rosenthal and Erteszek designs, and

thereafter submitted a new Claim 7 to substitute for Claim 1 and a further written explanation of the functional differences between the two designs, stating in part:

"As the Examiner has indicated in the Official Action of December 10, 1963, one of the principal differences between the applicant's garment and that disclosed in Rosenthal lies in the fact that the applicant's 'panel' overlies or is on the outside of the torso encircling body. However, this is not, as suggested, merely a matter of choice since the applicant's structure permits achieving a result which is not possible in, or even comprehended by, Rosenthal's patent. In the applicant's structure, when tension is applied to the crotch portion, the 'panel' is tensioned, and this can impose a flattening force on the underlying abdominal portions of the wearer. Such force is superimposed on that of the torso encircling body to produce an important cooperative effect. On the other hand, in Rosenthal, when tension is applied downwardly by the crotch portion, the insert would be pulled inwardly away from the torso encircling body."

Thereafter the Examiner found the application allowable (with the new Claim 7 becoming Claim 1), and Letters Patent for Patent No. 3,142,301 were issued July 28, 1964.

b.  *The 300 Patent*

The application for the 300 patent was filed April 29, 1963. As noted earlier, the 301 application had been filed on November 20, 1962.

Basically the claims in the 300 application were the same as the claims in the 301 application except for the addition of the inside crotch piece.

Mrs. Erteszek submitted a preliminary amendment on October 4, 1963. On February 28, 1964 the Examiner rejected all the claims in the 300 application on the ground that they were indefinite and incomplete, and on the ground that the crotch piece element did not constitute a patentable change over certain prior patents, including the Rosenthal patent referred to earlier.

Mrs. Erteszek submitted an amendment on April 10, 1964. Counsel for Mrs. Erteszek interviewed the Examiner on May 12, 1964. Another amendment was submitted on May 21, 1964.

Thereafter the Examiner found the amended application allowable, and Letters Patent for Patent No. 3,142,300 were issued July 28, 1964—the same date the 301 patent was issued.

*Marketing of the Olga Garment*

A garment based on the 300 design was marketed by Olga beginning in 1963. The grament met with immediate commercial success.

By the time of the trial of this action the Olga brief had been on the market for ten years. The number of units sold and the dollar volume of sales were as follows:

| Year | Units | $ of Sales |
|------|-------|------------|
| 1963 | 70,502 | 264,383.00 |
| 1964 | 74,638 | 279,893.00 |
| 1965 | 60,810 | 228,030.00 |
| 1966 | 73,626 | 280,535.00 |
| 1967 | 73,314 | 293,256.00 |
| 1968 | 82,195 | 329,243.00 |
| 1969 | 59,424 | 237,694.00 |
| 1970 | 46,457 | 185,825.00 |
| 1971 | 62,198 | 254,925.00 |
| 1972 | 69,323 | 270,358.00 |

A former executive vice president of Vanity Fair has testified that a ten-year commercial life span for a garment is indicative that the garment performs a fundamental or basic function—rather than being merely a matter of transitory fashion.

*The Vanity Fair Garment*

Vanity Fair has marketed various models of briefs over the years. Prior to the introduction of the alleged infringing garment, the Vanity Fair briefs were apparently conventional garments with standard leg openings. The evidence is sufficient to indicate that these Vanity Fair briefs were less than successful in respect to stomach control and leg comfort.

For instance, in 1964 Vanity Fair introduced its model 40–6. This model was marketed from 1964 to 1967 and then withdrawn. This garment was advertised as follows:

"Curved-away shaping at front of leg gives complete freedom and comfort, back darting insures perfect ease and fit under all clothes including active sportswear. Important: double-strength Lycra panel in front gives extraordinary control in so minimal a brief."

Grove H. Lands, merchandise manager of Vanity Fair, testified at the trial regarding the development and marketing of various Vanity Fair garments. Although he was naturally reluctant to admit any lack of success in a Vanity Fair product, the evidence is quite convincing that the model 40–6 and other similar Vanity Fair briefs had problems. For instance, Mr. Lands testified in his deposition that the 40–6 did not really succeed. It did not have sufficient abdomen control. He also indicated in his deposition that "one of the biggest negatives" in Vanity Fair briefs was leg binding.

Vanity Fair set out to develop an improved type of brief. The result was the alleged infringing garment, Vanity Fair model 40–28. This model was introduced in the market in the fall of 1967. At this same time, model 40–6 was dropped. Another Vanity Fair brief, model 40–50, was dropped at the same time.

Vanity Fair model 40–28 was essentially the same garment as the Olga 300 brief, having exactly the same arrangements for the overlying front panel and the flexible leg openings. There were a few differences between the two garments in other respects. For instance, in the Vanity Fair garment the two ends of the girdle member overlapped at the front of the garment; whereas in the Olga garment, the two ends of the girdle member did not overlap. But the unique, patented features of the Olga garment appeared virtually without change in the Vanity Fair model.

Vanity Fair's designer for model 40–28 admits that she was familiar with the Olga garment and had it in her design studio. Vanity Fair's former executive vice president testified that he discussed with Vanity Fair's vice president for sales the matter of developing an improved brief. The latter regarded the Olga brief as one of the better selling briefs in the industry, having certain desirable functional characteristics—greater control at the waist and an improved leg opening.

Vanity Fair marketed its model 40–28 from the fall of 1967 until sometime in 1969, when it was discontinued. During this time model 40–28 was Vanity Fair's largest selling brief. The total quantity sold was 12,455 dozen. It is not clear why the model was discontinued.

## Conclusions of Law

### Validity of Olga Patents

Vanity Fair concedes that it has the burden of proving the invalidity of the challenged Olga patents.

The familiar requirements for patentability are that the article must be (1) useful, (2) novel, and (3) non-obvious. 35 U.S.C. §§ 101–103. Vanity Fair bases its assertion of invalidity upon the claim that the subject matter sought to be patented was "obvious" within the meaning of 35 U.S.C. § 103, which provides in pertinent part:

"A patent may not be obtained . . . if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."

The Supreme Court has described the nature of the inquiry into the question of obviousness as follows:

"Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill

in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy." Graham v. John Deere Co., 383 U.S. 1, 17–18, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966).

At the trial Vanity Fair introduced evidence regarding prior art, consisting of some 13 examples of girdles, panty girdles and briefs. Patents had been issued as to 11 of these. The only one of these garments which Vanity Fair seriously contends to have anticipated the Olga patents in question is the garment based upon Rosenthal Patent 2,763,008 previously described, which was marketed in 1955 by Maidenform.

I find that neither the Rosenthal patent, nor any of the other examples of prior art referred to by Vanity Fair, anticipated, or made obvious, the Olga patents.

A number of the examples referred to by Vanity Fair are girdles or panty girdles, which, as already described, are fundamentally different from the type of garment involved in the Olga patents—the brief. These girdles and panty girdles did not include or anticipate the unique panel and leg-opening arrangements which characterized the Olga patents.

With regard to briefs, Vanity Fair has referred to a number of examples which preceded the Olga patents, including the Gossard garment referred to earlier. However, none of these briefs included or anticipated the panel and leg-opening arrangements of the Olga patents.

In connection with the Rosenthal patent, Vanity Fair relies strongly on the fact that the Patent Examiner twice rejected the Olga 301 patent claims on the basis that they had been anticipated by the Rosenthal patent. Vanity Fair asserts (and the Patent Examiner at first held) that the Olga patents were merely obvious rearrangements of elements contained in the Rosenthal patent. Vanity Fair contends that the Rosenthal and Olga designs are basically the same, except for the fact that in Rosenthal there is a panel running downward *inside* the girdle member, whereas in the Olga patents the downward panel runs *outside* the girdle member. Vanity Fair relies on cases such as Warner Bros. Co. v. American Lady Corset Co., 48 F.Supp. 417 (S.D.N.Y.1942), aff'd, 136 F.2d 93 (2d Cir. 1943), which hold that an obvious rearrangement of familiar elements does not constitute invention.

But the *American Lady* case involved merely the shifting or rearrangement of panels of stretch material in the design of a corset. It is not controlling here. What is involved in the present case is a novel type of garment construction, which was far from obvious, as demonstrated by the history of unsuccessful efforts by other designers to solve certain basic structural problems.

I cannot agree that the Olga garment involved an obvious rearrangement of the elements of Rosenthal. The differences between the two garments are far more fundamental than simply a change in position of a panel. It is true that the Rosenthal garment contains a kind of panel running downward inside of the girdle member, whereas the Olga garment has a panel running downward outside the girdle member. But the overall result reached in the Olga garment is utterly different from the result in the Rosenthal garment. The relationship between the downward panel and the girdle member in Rosenthal does not in any way create the type of flexible leg openings involved in the Olga patents, nor are such flexible leg openings even suggested by the Rosenthal design. The degree and type of stomach control are radically different in the two garments. Some indication of the distinc-

tion is given by the title of the Rosenthal garment stated in the patent application—"girdle panty *garter belt.*" I cannot conclude that Rosenthal suggested or anticipated the Olga design.

The Patent Examiner's initial rejections of the Olga 301 patent on the basis of Rosenthal are of very little persuasive value. They were made on the basis of drawings and written descriptions, which were not fully illuminating. After the Patent Examiner had the benefit of actual sample garments and full explanation, the 301 patent was allowed.

In any event, our Court of Appeals has recently emphasized the appropriateness of viewing prior art in the context of the problems in the particular industry or trade. In Shaw v. E. B. & A. C. Whiting Co., 417 F.2d 1097, 1104–1105 (2d Cir. 1969), cert. denied, 397 U.S. 1076, 90 S.Ct. 1518, 25 L.Ed.2d 811 (1970), the Court stated, in dealing with the patent there involved:

"Here . . . individually old concepts were combined to solve an existing problem in the art, and

Where the invention for which a patent is sought solves a problem which persisted in the art, we must look to the problem as well as to its solution if we are to properly appraise what was done and to evaluate it against what would be obvious to one having the ordinary skills of the art. In re Rothermel, 276 F.2d 393, 397, 47 C.C.P.A. 866 (1960).

"The district court failed to evaluate the problem posed by the prior art and appears to have relied on the proposition that, as Shaw's solution to the problem seemed a simple one, his filament was an obvious outgrowth. The simplicity of an invention or an improvement thereof is not, however, the test of its obviousness. Goodyear Tire and Rubber Co. v. Ray-O-Vac Co., 321 U.S. 275, 279, 64 S.Ct. 593, 88 L.Ed. 721 (1944). Further, the burden is on the appellee to show *facts* that would lead to the conclusion that appellant's product was obvious. The mere recital of the known elements in the art does not, without more, invalidate the patent under Section 103. There must appear evidence that the *bringing together* of these elements would have been obvious. Doubt as to validity, no matter how strong, cannot justify resort to unfounded assumptions or supply deficiencies in the factual background. Graham v. John Deere Co., *supra.*"

The Supreme Court in Graham v. John Deere Co., 383 U.S. 1, 17–18, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966) has described certain of the factual considerations to be taken into account—commercial success, long-felt but unsolved needs, failure of others.

When the factual background is considered, Vanity Fair's claim of obviousness with respect to the Olga patents must be rejected. The evidence demonstrates that the foundation garment industry had worked for many years to solve two problems in the design of panty briefs. It proved to be difficult to build into a light garment such as a panty brief any adequate stomach control. Also, there was the aggravation of the leg and crotch discomfort. These were basic problems, and they pertained to a type of foundation garment which was becoming more and more important as women's outerwear styles changed to shorter skirts, increased use of pants, etc.

The Olga design—relating to an outer panel, inside crotch piece, and girdle member in such a way as to achieve greater stomach control while affording greater leg and crotch comfort—involved a unique and novel garment structure. In 20 years or more of designing and marketing panty briefs, the foundation garment industry had not produced a design with these benefits. Whether the Olga design is the ultimate solution to the problems described above is something which I cannot, and need not, determine. What the record does show

clearly is that Olga arrived at a highly original construction, which offered a solution of the stomach and leg and crotch problems in a way no other design appears to have attempted. The Olga garment has had an unusually long and successful commercial life.

The circumstances of the development of the accused Vanity Fair garment in themselves tend to negate the claim that the Olga designs were obvious. Prior to the design of the accused garment, Vanity Fair's garments partook of the typical stomach and leg problems. Vanity Fair sales executives requested the company's designers to come up with a garment which offered a better solution to these problems. What the Vanity Fair designers arrived at was none other than a garment precisely embodying the features of the Olga garment. The accused Vanity Fair garment was that company's most successful brief during the time it was marketed.

█ ██ Under all the circumstances, I hold that Vanity Fair has not met its burden of proving that the matters presented in the Olga 301 and 300 patents were obvious.

One further argument of Vanity Fair must be dealt with. Vanity Fair contends that the Olga 300 patent is invalid because the Olga 301 patent constituted anticipatory prior art.

This argument must be rejected. It is true that a problem *can* arise when the same inventor attempts to obtain successive patents for basically the same invention. This is the problem of "double patenting", and the vice is that such double patenting may lead to a prolongation of the inventor's monopoly. Application of Braithwaite, 379 F.2d 594, 601, 54 C.C.P.A. 1589 (1967). But it has been held that where the inventor makes a "terminal disclaimer"—*i. e.*, where the inventor agrees to having the second patent terminate upon the expiration date of the first patent—then both patents may be allowed. Application of White, 405 F.2d 904, 906, 56 C.C.P.A. 870 (1969); Application of Braithwaite, *supra.*

The rule allowing two patents by the same inventor where there is a terminal disclaimer applies by analogy in the present case. Here, because the two patents were granted *on the same day*, both patents will automatically terminate at the same time. Thus there is no possibility that the second patent will create an improper extension of time for the monopoly. Under these circumstances, both the Olga 301 and 300 patents should be upheld.

This result accords with common sense. From a realistic standpoint, the 301 design cannot be held to be "prior art" with respect to the 300 design. Both the 301 and the 300 designs were in fact part of the same inventive process. The 300 design incorporated the elements of the 301 design and made a substantial improvement. For the purposes of patent validity, both designs and both patents should be treated together, as the Patent Office ultimately did in granting the two patents on the same day.

For the above reasons, I hold that Vanity Fair has not proved the invalidity of the Olga 301 and 300 patents.

*Infringement*

Vanity Fair's only defense to Olga's counterclaim for infringement is the contention that the Olga patents are invalid. My rejection of Vanity Fair's claim of invalidity necessarily resolves the infringement question. In any event, it is clear that the accused Vanity Fair garment contains the essential patented features of the Olga 301 and 300 patents. Vanity Fair is thus liable for infringement.

*Damages*

██ ██ Assessment of damages for infringement is governed by 35 U.S.C. § 284, which provides:

"Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the

infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court.

"When the damages are not found by a jury, the court shall assess them. In either event the court may increase the damages up to three times the amount found or assessed.

"The court may receive expert testimony as an aid to the determination of damages or of what royalty would be reasonable under the circumstances."

The statute provides that damages shall be no less than a reasonable royalty. The evidence shows that Vanity Fair was selling its briefs at $45.00 per dozen. The 12,455 dozen briefs sold by Vanity Fair were thus sold for $560,475. The evidence presented by Olga would justify a royalty rate of 5%. Such a royalty on sales of $560,475 would be $28,024.

Olga concedes that any lost profits did not exceed this royalty figure. Thus the amount of damages awarded to Olga is $28,024. In addition, interest is awarded from January 1, 1968—the median point for the infringement.

Olga has requested application of the statutory provision for award of treble damages. In my view, the circumstances of this case do not justify trebling.

### Conclusion

Vanity Fair's complaint charging the invalidity of Olga patents 3,142,301 and 3,142,300 should be dismissed. Olga is entitled, on its counterclaim, to a declaration of the validity of the patents and an injunction against Vanity Fair prohibiting further infringement. Olga is further entitled to damages in accordance with this opinion.