55 CCPA

**Application of Arthur Philip JENTOFT.**

**Patent Appeal No. 7905.**

United States Court of Customs
and Patent Appeals.

April 18, 1968.

Harry B. Keck, Pittsburgh, Pa., for appellant.

Joseph Schimmel, Washington, D. C. (Joseph F. Nakamura, Washington, D. C., of counsel), for the Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, SMITH, ALMOND and KIRK-PATRICK,* Judges.

RICH, Judge.

This appeal is from a decision of the Patent Office Board of Appeals affirming the rejection of claims 3, 9, 13, and 14

* Senior District Judge, Eastern District of Pennsylvania, sitting by designation.

of application serial No. 144,610, filed October 12, 1961, for "Extensible Plug Valve." In his brief, appellant "waives the appeal" as to claims 13 and 14 so as to them the appeal will be dismissed, leaving for consideration only claims 3 and 9.[1]

This is an obviousness-type double patenting case in which a terminal disclaimer has been filed and considered below. The sole ground of rejection is double patenting founded on certain claims of appellant Jentoft's patent No. 3,010,692, issued Nov. 28, 1961, on an application filed Nov. 20, 1959, copending with the application at bar from Oct. 12 to Nov. 28, 1961. The patent is not, of course, prior art. To support the double

patenting obviousness contention, the following prior art is relied on:

Work             2,584,523 Feb. 5, 1952
Eisele (German)   800,228 Oct. 17, 1950

### The Patented Invention

Broadly, the invention is a gas-flow control valve capable of remote control by fluid pressure which actuates the valve. More particularly, it is an air valve for ventilation systems. The patent discloses two embodiments both operating on the same broad principal but with differing structure. Reproduced below are Fig. 1, showing one embodiment, and Figs. 8 and 9, showing the other embodiment as well as the mode of operation.

FIG. 1

FIG. 8           FIG. 9

Referring to Fig. 1, the air duct is 10 and has an outwardly flared horn 11 at its end where it would open into a room. Suspended in front of the horn by brackets 16 is a cone-shaped structure consisting of a base 14 and a perforate, rigid, stationary cone 15 of metal over which is mounted a conical membrane 19 of

---

1. Claims 5, 10, 11, and 15 have been allowed. Other claims in the application but withdrawn from further consideration under Rule 142(b) are claims 7, 8, and 12. As to them, the board dismissed the appeal and they are not before us.

resilient, expansible material such as rubber. The membrane 19 is attached to the base in air-tight fashion by strap 29 secured in groove 28. Pipe 22 admits control air into the conical chamber for the purpose of inflating the membrane 19 to partially or fully close the annular passage between it and the horn 11 to control the flow of air through the duct 10.

A modified form, having the advantage of lighter weight, is shown in Fig. 8 wherein the baseplate 14 of Fig. 1 is omitted and the supporting cone 32 is made imperforate, having the air inlet 35 attached to and passing through it at boss 33. Fig. 9 shows, in connection with the Fig. 8 embodiment of the invention, how the expansible membrane operates to effect a valving action when it is inflated.

(The Fig. 1 form inflates in the same way.) Dotted line 36a shows the valve partially closed, full line 36b shows it fully closed, and dotted line 36c shows how, on further inflation, the membrane is in contact with the horn over a substantial area. The disclosure of the patent is limited to these two forms of the invention and all of its claims are limited to a "conical membrane of resilient, expansible material" as the means for controlling the flow of air. This is called the "balloon" type valve.

### The Invention of the Application

In contrast with the balloon type valve of the patent, the valve of the application is called the "bellows" type. Fig. 1 is reproduced:

Instead of having an *expansible* membrane resting on a *stationary* cone and acting as a valve by being *inflated,* the invention of the application secures to the fixed backplate 20 a normally collapsed bellows 24, joined air-tight therewith and with a cone-shaped "plug" 22 attached to the other end of the bellows. This plug, as the specification says, "preferably is a hollow conical plug of relatively rigid material such as stiff rubber, sheet metal or plastic materials." Alternatively, it is of "thin resilient material such as rubber." Operation of that alternative is stated to be "similar

in all respects to the operation of the preferred embodiment." Or the plug may be solid, "of lightweight plastic material such as rubber, foamed rubber, foamed polyurethane, and the like." Valve action is produced, upon changing the air pressure in the closed chamber formed by backplate, bellows, and plug, by *axial* movement of the plug as permitted by the bellows and shown in dotted lines illustrating the closed position. To prevent drooping of the plug when the bellows is extended, it is necessary to provide supporting means 46 which is shown above as consisting of a

tube 48 fixed to the backplate at 49 and a rod 50 sliding in the tube and attached to the apex of the conical plug. Other supporting means such as lazy-tongs are disclosed.

It also appears that with this plug valve moving axially it is unnecessary to have the horn 11 and it has therefore been omitted from some claims. Without it, the plug would move in and out of the open or terminal end of conduit 10.

### The Rejection

Claims 3 and 9 on appeal stand rejected on the sole ground of "double patenting over claim 5 of applicant's patent (3,010,692) modified either in view of (1) Eisele taken with Work or (2) Work take with Eisele." (Examiner's Answer.)

Work discloses a pressure relief valve for use in fluid pressure systems in which a fluid-pressure-actuated metal bellows raises and lowers a flat valve disk relative to its seat. Inside the bellows is a telescoping rod-and-tube guiding and aligning means.

Eisele discloses a condensate discharge valve built inside a common tee fitting, the side outlet of which is plugged. In the upper leg of the tee and operating downwardly a metal bellows filled with low boiling point liquid is mounted. On the lower end of the bellows is a closure cap carrying a conical plug. The lower leg of the tee is provided with a valve seat having an aperture cooperating with the plug to form a valve. When condensate surrounds the bellows it contracts and opens the valve to discharge the condensate and when steam surrounds the bellows it expands and closes the valve. It is cited for its disclosure of the conical shape of the plug and for its bellows actuation.

Claim 5 of Jentoft's patent reads:

5. A gas flow regulating valve for *controlling the flow of gas from a con-duit terminal*, comprising an outwardly flared horn engageable in communicating [relation] at *its* narrow end with said conduit terminal, a base plate secured in spaced outer relation to the expanded end of said horn *by means of spaced support arms extending from said base to the rim of said horn, a rigid, perforate cone extending from said base plate coaxially into said horn*, a conical membrane of resilient, expansible material secured at its base to said base plate and extending coaxially into said horn and being in its relaxed condition spaced apart from the inner wall of said horn *substantially overlying said rigid cone* to provide an annular gas passageway leading outwardly from said conduit, said conical membrane and said base plate forming an enclosed valve operating chamber, and an inlet tube extending into said valve operating chamber to admit fluids thereinto whereby said conical membrane may be extended outwardly to constrict the annular space between said membrane and said horn. [Emphasis added for reasons referred to later under "The Board Opinion."]

As is evident, claim 5 recites the elements and functional relationships thereof present in the Fig. 1 embodiment of the balloon-type valve described above. It delimits, therefore, a rather narrow patent right to that specific valve—that is, the right to exclude others from making the valve of Fig. 1 of the patent.

The examiner's position on "double patenting" must mean that in his opinion the appealed claims delimit another potential patent right on a valve which, in view of the prior art disclosures of Work and Eisele, is merely an obvious modification of the patented Fig. 1 valve defined in claim 5, taking into account the nature of the distinctions the examiner saw between claim 5 and the appealed claims. The examiner expressed himself on obviousness as follows:

* * * it is the examiner's position that it would be an obvious expedient to a person having ordinary skill in the art to substitute the bellows 6 and conical plug 9 of Eisele for the rigid, perforate cone and overlying conical membrane of resilient, expansible ma-

terial recited in lines 7–14 of claim 5 * * * since both the device of said claim 5 and of Eisele are pressure responsive valves.

That statement pertains to the obviousness not only of replacing the cone and membrane of the balloon valve with a bellows and conical plug but also mechanically arranging the same to operate by axial movement instead of expansion. As to adding the guiding means to keep the plug of the bellows valve in axial alignment during movement, the examiner continued:

Furthermore, it would be obvious to provide the device of claim 5 * * * as modified by Eisele with "an extensible alignment means" comprising telescopingly engaged "shafts" in view of the teaching of the use of such guide means * * * in the pressure actuated bellows valve of Work.

As to his alternative rejection on reversed application of the references, the examiner said:

Similarly, considering the second alternative, it would be obvious to substitute the bellows operated valve and alignment means shown in Work * * * for the expansible membrane of the device claimed in claim 5 of Jentoft * * * and to provide the valve of said device of claim 5 as modified by Work with any type valve head desired; such as, for example, the conical head of Eisele.

### The Appealed Claims

To make the rejection fully intelligible, it must be related to the claims on appeal.

Claim 3 depends from claim 9 and recites only details of the alignment means, defining it to be the telescoping shaft arrangement shown above in the application drawing. It need not be further considered.

Claim 9 is the only claim we need discuss. It reads (original format):

9. A gas flow regulating valve for controlling the flow of gas from a conduit terminal, comprising:

a back plate secured in spaced outer relation to the end of said conduit terminal;

a normally collapsed, resilient bellows having one end secured to the said back plate;

a plug having a base end and an apex end and having a diminishing cross-sectional area from the said base end to the said apex end, said plug being positioned between the said bellows and the said horn [2] and having its said base end secured to the other end of the said bellows whereby the said back plate, the said bellows and the said plug define a chamber, said plug being moveable axially toward and away from the said conduit terminal solely by the extension and contraction of the said bellows;

extensible alignment means within the said chamber for maintaining the said plug substantially axially aligned with the central axis of said conduit terminal; and

conduit means for introducing and withdrawing fluids from the said chamber whereby the said plug moves axially toward and away from the said conduit terminal to control the flow of gas therefrom.

### Patent Claim 5 and Application Claim 9 Compared

Claim 9 is clearly directed to the bellows type of valve shown above in the application drawing in which there is an axially movable "plug" rather than an expansible, resilient membrane as in the balloon type of valve. Claim 9 and patent claim 5 are both combination claims.

2. The word "horn" should be read "conduit terminal." As will be seen, there is no antecedent in the claim for "said horn" by reason of the fact, as shown in the record, that reference to the "outwardly flared horn" was deleted from the claim by amendment because it was not an essential element with this form of value. The above reference to the horn, which should also have been amended, was evidently overlooked.

The elements recited in patent claim 5 are horn, baseplate, support arms, perforate *rigid (and immovable) cone, expansible* membrane, and inlet tube (for control fluid). The elements recited in appealed claim 9 are backplate, *bellows, axially movable* plug, *alignment means,* and conduit means for control fluid. Obviously, two different mechanisms are defined, operating in different ways, albeit they accomplish the same result, control of air flow. Clearly they are different inventions. The examiner recognized as much and referred to them as "the invention disclosed in the patent and invention disclosed in the instant application." The disclosures are different, if not mutually exclusive, and the two claims under consideration closely correspond to the disclosures.[3]

Wholly separate and distinct inventions being claimed in the claims on appeal and in the only patent claim relied on to support the double patenting rejection, we do not have here a "same-invention" type of case but only an obviousness-type double patenting rejection, the examiner's reasoning on obviousness being set forth above.

### The Terminal Disclaimer

Faced with an obviousness-type double patenting rejection which was made final, appellant filed a terminal disclaimer[4] and argument as to why it should be accepted as overcoming the rejection, citing our decision in In re Robeson, 331 F.2d 610, 51 CCPA 1271.

At this point, the examiner brought another claim of the patent into the picture, not as basis for the rejection but as reason for refusing to follow *Robeson.*[5] The examiner said:

> The terminal disclaimer * * * is not considered effective to obviate the double patenting rejection * * * since the patent to Jentoft contains claim 2, the subject matter of which is generic to both the invention disclosed in the patent and the invention disclosed in the instant application. The rejection * * * is therefore repeated.

The examiner amplified his position in his Answer. He said claim 2 "overlaps or dominates the subject matter covered by the claims of the present application." This he attempted to demonstrate by parallel analysis of claim 2 and appealed claim 9. He said this was a "vital" difference from the facts in *Robeson* and *Kaye.* "Thus," he said, "the matter of harassment by multiple assignees was not a possibility in the situations presented by the said Kaye and Robeson situations." Because of the overlap, he said,

> * * * In re Siu, 42 CCPA 864, 222 F.2d 267, 105 USPQ 428, rather than * * * In re Kaye and In re Robeson applies and the rejection based on double patenting has not been obviated by the filing of a terminal disclaimer.

3. There is no formal relationship between the application at bar and the patent or its application. While there was co-pendency, neither contains any reference to the other, so far as the record shows, apart from the showing in the file of the present double patenting rejection.

4. Actually he filed two. The first was objected to as to form in being limited to the rejected claims. He filed a new one referring to any patent granted, which was accepted and considered by the examiner. Disclaimer was by H. H. Robertson Company, a Pennsylvania corporation, of Pittsburgh, as owner of the application.

5. The distinction of purpose was made very clear by the examiner. Appellant was perplexed as to whether the rejection was based on claim 5 or on claim 2 and requested clarification, which was given as follows:
   * * * rejection of claims 3, 9, 13 and 14 is based on claim 5.
   Reference to claim 2 was made for the purpose of pointing out that the patent contains a claim to subject matter which is generic to the subject matter being claimed in the instant application to establish a basis for the holding that the doctrines of In re Robeson, 141 USPQ 485, and In re Kaye [332 F.2d 816, 51 CCPA 1465], 141 USPQ 829, do not apply.

### The Board Opinion

The board's very short opinion gave a blanket approval to the examiner's position. It also specifically agreed with the examiner that it would be obvious that "the conical structure recited in claim 2 of appellant's patent 3,010,692 could be moved into and out of valve closing position by a bellows type actuator such as shown by the secondary references." (We will assume the board meant claim 5, not claim 2, as the Patent Office Solicitor also seems to assume, otherwise the board would have been making a new rejection, not apparently intended. What is in claim 2 of the patent is shown by omitting the italicized portion of claim 5, quoted above.) The board then said:

> The terminal disclaimer filed by appellant is ineffective for its intended purpose.

> The court pointed out in the Robeson case * * * that the objections to double patenting were (1) extension of monopoly, (2) harassment by multiple assignees, and (3) avoidance of file wrapper estoppel by filing of a second application.

> In the present case the terminal disclaimer might resolve the question of extension of monopoly but the disclaimer does nothing towards resolving the second and third objections recited in the next preceding paragraph. The generic claim 2 in the patent would permit appellant, his assignee, or different assignees holding title to one of the applications [sic] to harass members of the public with multiple suits.

### OPINION

The several possible issues before us are: the obviousness question; whether patent claim 2 is actually generic and would be infringed by the apparatus described and claimed in the application or, specifically, claim, 9 thereof; whether, if claim 2 is generic, that would prevent the disclaimer from overcoming the rejection for double patenting; whether the disclaimer overcomes the rejection even if the other questions are decided in favor of the Patent Office and against appellant.

The Patent Office brief treats the questions of double patenting and the effect of the terminal disclaimer as separate issues, considering, first, whether there would be "double patenting" without the disclaimer and, next, whether the disclaimer "obviates" it.[6] Although from the standpoint of *patentability*, under all the circumstances, the two questions are inextricably intertwined, we will approach the problem in the same progressive order. That is the way it developed in the prosecution and the way it was approached below—one question at a time.

■ While we have serious doubts about both obviousness[7] and the generic

6. One might almost take the filing of a terminal disclaimer in response to a "double patenting" rejection to be a tacit admission that, without it, there would be double patenting except for the observation we have made in these cases that applicants frequently like to argue *both* issues. It is an unhappy circumstance to file a terminal disclaimer in a case where, on appeal, it turns out to have been unnecessary. For a solution to that problem see Ex parte Fertig et al., 155 USPQ 475, decided May 12, 1967, wherein the Board of Appeals, in an obviousness-type double patenting case, affirmed the holding of obviousness and double patenting but recommended under Rule 196(c) "that the claims on appeal be considered allowable upon the presentation of a proper terminal disclaimer," applicant having offered, before the examiner, to file such disclaimer. The recommendation was predicated on our *Robeson* and *Kaye* decisions and on a finding that there was no "overlap" in the claims, a matter dealt with by us subsequently in the *Braithwaite* cases, infra.

7. Our doubt on this score rests in part on the allowed claims. It would appear from the record that the examiner allowed claims, as to *unobvious* inventions, which are like claim 9 except that the "plug" is recited to be rigid and hollow, or of thin resilient material. The distinction is a tenuous one.

nature of claim 2,[8] we find it unnecessary to pass on these issues in view of the effect which we think should be given to the terminal disclaimer. We will assume, arguendo, both obviousness in the double patenting sense [9] and the presence in the patent of a generic claim (which, we presume, produces what the Patent Office has been referring to of late as "overlap"). Based on these assumptions, a "double patenting" situation exists which suffices to prevent issuance of a patent on the application at bar, absent a terminal disclaimer.

Turning to the effectiveness of the terminal disclaimer to obviate the double patenting objection, we note, first, that there are clearly distinct inventions in the patent and application and that we are not here presented with a possible single invention issue. Therefore, cases such as In re Siu, relied on by the examiner, are inapposite. Likewise, 35 U.S.C. § 101 cited as a statutory basis in such cases is not involved and the rejection rests solely on case law.

■ Since this is an obviousness-type double patenting situation, we hold that the terminal disclaimer, timely filed and considered by both the examiner and the board, obviates the double patenting rejection even if, as assumed, there is "overlap."

Our decisions in the two cases entitled In re Braithwaite, 379 F.2d 594 and 606, 54 CCPA 1589 and 1604, decided June 15, 1967, a year and a half after the board decision and after the filing of the Patent Office brief herein, should answer many of the questions herein raised. In those cases we did not consider domination or "overlap" to be a significant or control-

ling factor. Nor do we here on somewhat different facts.

### No Extension of Monopoly

■ The board was apparently of the view, though cautious in expressing it, that the terminal disclaimer obviates the extension of monopoly objection to granting the second patent, even assuming it claims subject matter differing only in an obvious manner from that claimed in the issued patent. We will strengthen the board's tentative opinion by expressing our conviction that that is so.

■ Referring to our opinion in *Robeson*, the board raises two other often-voiced presumed problems, harassment and avoidance of file-wrapper estoppel (so-called). It will be observed that in *Robeson* we did *not* approve of those arguments as grounds for supporting a rejection, we merely observed that they are points to be considered. We found them insufficient in *Robeson* to support the rejection.

### File-Wrapper Estoppel Not Avoided

■ On the matter of avoiding file-wrapper estoppel, we will now be more specific. We do not believe that it is a possibility, at least in a properly tried case before a competent court. This is amply demonstrated in a recent case, C-Thru Products, Inc. v. Uniflex, Inc., 262 F.Supp. 213 (E.D.N.Y.1966). There a second patent on a subcombination of a combination claimed in an issued patent was obtained with the aid of a terminal disclaimer. The court said (p. 218):

Under the circumstances, the effect of file wrapper estoppel may not be avoided by the filing of a second appli-

---

**8.** We have difficulty reading claim 2 of the patent on the axially moving plug valve of the application since it requires a "conical *membrane* of *expansible* material" which is spaced from the horn in its "relaxed condition," thus implying expansion and a balloon-type of operation. It is unclear, to say the least, how it would be infringed by a rigid, axially-moving, plug valve.

**9.** We thus qualify the term "obviousness" to distinguish it from an issue under 35 U.S.C. § 103 and as a reminder that it is predicated only *partially* on prior art, the subject matter claimed in the applicant's own copending patent being a necessary basis for the finding, without which it would not be possible. If possible, then the rejection should be on prior art, not for "double patenting."

cation together with a terminal disclaimer.

The claim in the second patent was held subject to file-wrapper estoppel limitations based on the prosecution of the application for the first patent. This argument for refusing effect to terminal disclaimers is totally wanting in substance.

### Harassment Argument Lacks Substance

■ As to the mere possibility of harassment, while we do not regard it as an impossibility, we think that giving weight to it to deny effect to terminal disclaimers is to overlook the countervailing advantages to the public, pointed out in *Braithwaite*, in encouraging (1) additional disclosures of developments made subsequent to the initial filing, (2) earlier initial filing and patenting on the first application instead of sequential continuing and "c-i-p" applications which may not issue, and (3) consequent earlier expiration of patents and availability of inventions to the public generally.

In *Robeson*, the opinion refers to possible harassment through divided ownership, mentioning "multiple assignees." The implication is that if ownership remains in the same person, by original issue or assignment, the problem does not exist. Yet the board expands it to include "appellant, his assignee, or different assignees." The argument has always been predicated on *divided* ownership of overlapping patents. When there is common ownership, we think harassment by multiple suits is most unlikely. We are further of the belief that a person or corporation obtaining patents on inventions so closely related that they can give rise to double patenting rejections is most unlikely to divide the ownership of them. Though the *Robeson* opinion says that we do not "minimize" the possibility, inter alia, of harassment by "multiple assignees," upon further reflection there does not appear to us to be much to minimize on this score. In any event, it should be remembered that we refused, in *Robeson*, to accept the harassment argument.

The unreality of the harassment theory as a ground of refusing effect to terminal disclaimers is illustrated by the allowed claims in this case. By a very narrow margin they are just over the unobviousness hurdle in being slightly more limited in defining the "plug" than claim 9 which was held obvious in the double patenting sense. A patent issuing with these allowed claims will also be dominated by patent claim 2, assuming the examiner is right, just as would claim 9. There will thus be *two patents covering the same invention* which *could* fall into the hands of different assignees who could sue the same infringer and thus "harass" him. This is a very common situation existing with respect to genus and species, dominant and subservient, and "overlapping" patents, whenever there are *unobvious* differences, all granted in strict accordance with law and presumed valid. Yet we do not see the courts bogged down with harassment suits. In those rare instances where there is a situation which a court can be persuaded amounts to harassment, it has means for dealing with it by inflicting the plaintiff with attorney's fees. This can be a powerful deterrent. See the case relied on by the solicitor in his brief, supposedly as illustrating harassment, Tidewater Patent Development Co. v. Kitchen, 4 Cir., 371 F.2d 1004, modified on rehearing, at 1013. In that case, we note, there was neither divided ownership nor involvement of a terminal disclaimer and the issue of double patenting which finally invalidated the second, species patent, along with invalidity under 35 U.S.C. § 103, was one on which reasonable minds could differ. The Patent Office granted the patent and a Special Master and the District Court sustained it. The Court of Appeals felt otherwise.

### Conclusion

■ The terminal disclaimer here is effective to obviate the double patenting rejection of claims 3 and 9 which must

therefore be reversed. As to claims 13 and 14, the appeal is dismissed.

Reversed.

WORLEY, Chief Judge, concurs in the result.