**PHILLIPS PETROLEUM COMPANY, Shell Oil Company, Northern Petrochemical Company, and El Paso Products Company, Plaintiffs,**

.v.

**UNITED STATES STEEL CORP., Hercules Incorporated and Phillips Petroleum Company, Defendants.**

**Civ. A. Nos. 83–143, 83–148, 83–547, 83–801 and 84–79 MMS.**

United States District Court, D. Delaware.

March 8, 1985.

C. Waggaman Berl, Jr., Wilmington, Del. (Harry J. Roper, Sidney Neuman, George S. Bosy, Nicholas A. Poulos, and James P. Naughton, Neuman, Williams, Anderson & Olson, Chicago, Ill., of counsel), for Phillips Petroleum Co. and Shell Oil Co.

Charles S. Crompton, Jr., Potter, Anderson & Corroon, Wilmington, Del. (Francis T. Carr, and Kenneth E. Madsen, Kenyon & Kenyon, New York City, of counsel), for Northern Petrochemical Co., U.S. Steel Corp. and Hercules Inc.

Arthur G. Connolly, Jr., Connolly, Bove, Lodge & Hutz, Wilmington, Del. (Thomas F. Reddy, Jr., and Stanton T. Lawrence, III, Pennie & Edmonds, New York City, of counsel), for El Paso Products Co.

## OPINION

MURRAY M. SCHWARTZ, District Judge.

The invention of solid crystalline polypropylene has given rise to protracted litigation spanning several decades. In this action, Phillips Petroleum Company ("Phillips"), awarded a product patent in March, 1983 for crystalline polypropylene, has filed a suit against United States Steel Corporation ("U.S. Steel") and Hercules Incorporated for patent infringement. Separate actions have been brought against Phillips by Shell Oil Company, Northern Petrochemical Company, and El Paso Products Company ("El Paso") to obtain a declaratory judgment that the patent is invalid. These ac-

tions have been consolidated by orders of this Court dated September 26, 1983, December 22, 1983, and October 5, 1984. All parties adverse to Phillips, except El Paso, ("the movants") have filed a Motion for Summary Judgment urging the patent is invalid because of double patenting. The material facts, largely undisputed, are set forth below. A more comprehensive discussion of the history of the polypropylene patent litigation may be found in Judge Wright's opinion in *Standard Oil Co. (Indiana) v. Montedison, S.p.A.,* 494 F.Supp. 370 (D.Del.1980), *aff'd,* 664 F.2d 356 (3d Cir.1981), *cert. denied,* 456 U.S. 915, 102 S.Ct. 1769, 72 L.Ed.2d 174 (1982).

## Background

In the early 1950's, several companies in the United States and abroad were experimenting with methods of polymerizing [1] various olefins,[2] including ethylene and propylene. By 1953, Phillips Petroleum had developed a new chromium oxide catalyst [3] for use in the polymerization process.

Phillips discovered that use of the chromium oxide catalyst in the polymerization of ethylene permitted the production of polyethylene at lower pressures and less cost than had previously been possible.[4] The process had the added advantage of producing polyethylene of higher density and therefore greater commercial utility than was available at the time.[5]

Phillips also employed its new catalyst in the polymerization of propylene, yielding a solid product. Through fractionation [6] of that solid, Phillips was able to isolate a "hard, crystalline translucent solid," later known as solid crystalline polypropylene.[7] The resulting polypropylene, consisting essentially of recurring propylene units, had a high melting point and high density.[8] The present record indicates that prior to that time, the production of crystalline polypropylene was thought impossible.[9]

These discoveries led Phillips to file several related patent applications over the course of three years.[10] All were filed in

1. Polymerization is defined as "[a] chemical reaction, usually carried out with a catalyst, heat or light, and often under high pressure, in which a large number of relatively simple molecules combine to form a chain-like macromolecule." *The Condensed Chemical Dictionary* 835 (10th ed. 1981).

2. "Olefin" refers to a class of unsaturated aliphatic hydrocarbons having one or more double bonds. Olefins are generally highly reactive. *Id.* at 758.

3. A catalyst is "any substance of which a fractional percentage notably affects the rate of a chemical reaction without itself being consumed or undergoing a chemical change." *Id.* at 205.

4. Affidavit of William I. Bailey ("Bailey Affidavit") at 3, ¶ 7.

5. *Id.*

6. Fractionation is a process whereby the components of a mixture or a micromolecular complex are separated or isolated. *See The Condensed Chemical Dictionary* at 479.

7. *See Standard Oil Co. (Indiana) v. Montedison, S.p.A.,* 494 F.Supp. 370, 412 (D.Del.1980), *aff'd,* 664 F.2d 356 (3d Cir.1981), *cert. denied,* 456 U.S. 915, 102 S.Ct. 1769, 72 L.Ed.2d 174 (1982), filed as exhibit 1 of Docket Item ("D.I.") 46. Phillips' chemists first produced this substance on October 9, 1951. 494 F.Supp. at 411.

8. 494 F.Supp. at 412–18.

9. Bailey Affidavit at 9.

10. The genealogy of Phillips' patent applications and patents at issue in this litigation is depicted in the following table:

the names of John P. Hogan and Robert L. Banks, and were assigned to Phillips. Application No. 333,576, entitled a "Process for Polymerizing Olefins and Catalyst Therefor," was filed on January 27, 1953 ("the 1953 application").[11] A continuation-in-part ("CIP") of that application, Application No. 476,306, was filed on December 20, 1954.[12] Both of these applications disclosed the chromium oxide catalyst and referenced, *inter alia*, polypropylene as one of the many products which could be made with the catalyst.

In 1955, Guilio Natta and others working on behalf of Montedison, S.p.A., published a series of articles describing crystalline polypropylene in terms different than those contained in Phillips' 1953 application.[13] Montedison filed Application No. 514,099 on June 8, 1955, teaching the manufacture of solid crystalline polypropylene through the use of its newly developed organometallic catalysts.[14] On January 11, 1956, in an effort to provoke an interference with the Montedison application and to secure its patent rights to crystalline polypropylene,[15] Phillips filed another CIP of its 1953 application, Application No. 558, 530 ("the '851 application"), specifically claiming the product of crystalline polypropy-

**11.** *See* D.I. 46, exh. 3. The objects of the invention contained in the 1953 application are, *inter alia:*
> To provide a process for polymerizing olefins in contact with novel catalysts,
> To provide novel polymers of high molecular weight from 1-olefins of the character described,
> To provide novel catalysts for olefin polymerization.
*Id.* at A60–61.

**12.** *See* D.I. 46, exh. 4. The 1954 application was entitled "Polymers and Production Thereof." *Id.* at A175.

**13.** *Standard Oil,* 494 F.Supp. at 444 n. 755.

**14.** *Id.* at 374 n. 5.

**15.** Deposition of Donald Quigg, D.I. 46, exh. 13 at A707.

lene.[16] That application disclosed that crystalline polypropylene could be made both with Phillips' chromium oxide catalyst and with the organometallic catalysts developed by Montedison.[17]

While the '851 application was pending, Phillips filed yet another CIP—Application No. 573,877, filed on March 26, 1956 containing forty-four process claims utilizing the chromium oxide catalyst. On March 4, 1958, Patent No. 2,825,721 ("the '721 patent"), entitled "Polymers and Production Thereof," issued on that process patent application.[18] In September, 1958, the Patent Office instituted Interference No. 89,-634 involving Phillips' product patent application and the applications of Montedison and others to determine the priority of invention of the product, crystalline polypropylene.[19] The Board of Patent Interference ("the Board") granted priority to Montedison and on February 6, 1973, the Patent Office issued Patent No. 3,517,344 to Montedison.[20] Review of that determination followed in the federal courts. On January 11, 1980, Judge Wright overruled the decision of the Board and awarded priority to Phillips.[21] Judge Wright assigned Phillips a priority date of at least as early as January 27, 1953, based, *inter alia*, on Phillips' constructive reduction to practice as evidenced by the 1953 parent application. In addition, Judge Wright held, in the limited context of the interference proceeding, that the product of the Count was patentable to Phillips. 494 F.Supp. at 461.

Judge Wright's rulings in the interference proceeding were affirmed by the Court of Appeals for the Third Circuit in *Standard Oil Co. (Indiana) v. Montedison, S.p.A.*, 664 F.2d 356 (3d Cir.1981), *cert. denied*, 456 U.S. 915, 102 S.Ct. 1769, 72 L.Ed.2d 174 (1982), and the matter eventually moved back to the patent office for issuance of a new product patent on solid crystalline polypropylene. At that point, U.S. Steel, one of the movants in this action, filed a protest with the Patent Office pursuant to 37 C.F.R. § 1.291, alleging that the claim involved in the interference action had already received protection under claim 16 of Phillips' '721 patent.[22] The Patent Office considered and denied U.S. Steel's protest[23] and on March 15, 1983, issued Patent No. 4,376,851 ("the '851 patent") on Phillips' product claim.[24] The sole claim of the '851 product patent tracks the claim of Interference No. 89,634. The claim protects the product of:

> "[n]ormally solid polypropylene, consisting essentially of recurring propylene units, having a substantial crystalline polypropylene content." [25]

Movants have now raised the identical argument that U.S. Steel brought before the Patent Office—that the '851 patent

16. D.I. 46, exh. 7.

17. *Id.* at A569, A578.

18. D.I. 46, exh. 6.

19. The Interference count read "normally solid polypropylene, consisting essentially of recurring propylene units, having a substantial crystalline polypropylene content." *See Standard Oil*, 494 F.Supp. at 374.

20. *Id.* at 375 n. 18.

21. *Standard Oil Co. (Indiana) v. Montedison, S.p.A.*, 494 F.Supp. 370 (D.Del.1980), *aff'd*, 664 F.2d 356 (3d Cir.1981), *cert. denied*, 456 U.S. 915, 102 S.Ct. 1769, 72 L.Ed.2d 174 (1982).

22. *See* D.I. 46, exh. 8.

23. The examiner relied on Ex Parte Hogan, Appeal No. 436–63 (Bd. of Pat.App. Mar. 30, 1981), which was found to parallel the instant case.

The argument raised before the Patent Office Board of Appeals in *Hogan* was that Phillips' patent for the product of poly(4-methyl-1-pentene) was duplicative of the process claims contained in Phillips' '721 patent. The Board reasoned that the product claims could not be subject to a double patenting rejection over the patented process claims because "(1) the claimed polymer could equally well be prepared by other means, such as by the catalysts taught by Natta and Haven, and (2) different statutory classes are involved." *Hogan*, No. 436–63, slip op. at 5. It should be noted that a difference in statutory class is not, in itself, sufficient to overcome a double patenting challenge. *See infra* note 29 and cases cited therein.

24. *See* D.I. 46, exh. 9.

25. *Id.* at A674.

must be declared invalid for double patenting in light of claim 16 of Phillips' '721 patent. Claim 16 recites:

[a] process which comprises polymerizing propylene at a polymerization temperature in the range 150 to 250° F. with a catalyst comprising, as the sole essential effective catalytic ingredients thereof, chromium oxide supported on silica-alumina, said catalyst containing at least 0.1 weight percent hexavalent chromium at the initial contacting of hydrocarbon with said catalyst, and recovering a resulting solid polymer.[26]

The movants contend that the "resulting solid polymer" of claim 16 of the '721 patent and the product described in the single claim of the '851 patent are the same, as evidenced by their common origin in the 1953 patent application.[27] As a result, they argue that the extension of monopoly afforded by the issuance of the '851 patent should be overturned.

### The Law of Double Patenting

■ Stripped of all its verbiage, movants urge the Court to invalidate the '851 product patent because it represents either the same invention or an obvious variation of claim 16 of the '721 patent. The Court's inquiry must begin with the presumption, set forth in 35 U.S.C. § 282 (1984),[28] that the product patent is valid. In light of that presumption, the burden falls on the challenger to prove the patent's invalidity. *See, e.g., American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1358 (Fed.Cir.1984); *Astra-Sjuco, A.B. v. United States International Trade Commission*, 629 F.2d 682, 688 (C.C.P.A.1980); *Aluminum Co. of America v. Amerola Products Corp.*, 552 F.2d 1020, 1024 (3d Cir.1977); *Chicago Rawhide Manufacturing Co. v. Crane Packing Co.*, 523 F.2d 452, 458 (7th Cir.1975), *cert. denied*, 423 U.S. 1091, 96 S.Ct. 887, 47 L.Ed.2d 103 (1976); *Griswold v. Oil Capital Valve Co.*, 375 F.2d 532, 537 (10th Cir.1966). In double patenting cases, that burden is a heavy one. *See Carman Industries, Inc. v. Wahl*, 724 F.2d 932, 940 (Fed.Cir.1983); *Transmatic, Inc. v. Gulton Industries*, 601 F.2d 904, 913 (6th Cir.1979); *Reynolds Metals Co. v. Continental Group, Inc.*, 525 F.Supp. 950, 972 (N.D.Ill.1981).

■ In this action, movants' double patenting challenge involves a comparison of the claim of Phillips' '851 product patent with claim 16 of the expired '721 patent. Both patents have as their genealogical parent the 1953 application. The parties agree that the parent application and the two patents each disclose the invention of normally solid crystalline polypropylene and teach the preparation of that product through use of Phillips' chromium oxide catalyst. Patents which issue from co-pending applications may, however, overlap with respect to the information they disclose without necessarily resulting in double patenting. *See In re Swett*, 451 F.2d 631, 632 (C.C.P.A.1971); *In re White*, 405 F.2d 904, 906 (C.C.P.A.1969), *Tidewater Patent Development v. Kitchen*, 371 F.2d

---

26. D.I. 46, exh. 6 at A563.

27. Movants point to claims 22 and 31 of the 1953 application. Claim 22 recites:

[a] process for polymerizing an aliphatic 1-olefin having a maximum monomer chain length of 8 carbon atoms and no branching nearer the double bond than the 4-position, which comprises contacting at least one olefin in the class defined with a catalyst comprising chromium oxide intimately mixed with a support consisting essentially of a member of the group silica, alumina, and silica-alumina, in liquid phase, at a temperature in the range of 100° to 450° F., so as to produce a polymer comprising a liquid fraction, a tacky fraction, and a solid fraction.

D.I. 46, exh. 3 at A97.

Claim 31 of the same application protects: A solid polypropylene made by the process of claim 22 having a melting point in the range of 240 to 300° F., a density in the range of 0.90 to 0.95, an intrinsic viscosity in the range of 0.2 to 1.0 and a weight average molecular weight of at least 5,000.
*Id.* at A98.

28. 35 U.S.C. § 282 provides, in pertinent part: A patent shall be presumed valid. Each claim of a patent ... shall be presumed valid independently of the validity of other claims; ... The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity.

1004, 1009 (4th Cir.1966), *cert. denied,* 389 U.S. 821, 88 S.Ct. 46, 19 L.Ed.2d 74 (1967). It is the *claims* of the patent, rather than the information disclosed in the specification, that delineate the scope of the monopoly and are critical to the double patenting inquiry. *In re Baird,* 348 F.2d 974 (C.C.P.A.1965). Indeed, the doctrine of double patenting, the prime function of which is to prevent an unwarranted extension of the statutory monopoly period of a valid patent, is concerned only with "attempts to *claim* related subject matter twice. It does not preclude a second patent on subject matter which is disclosed but not claimed in the first patent." 3 Chisum *Patents* § 9.01.

■ Although the specification confers no monopoly, it may, in certain instances, aid in determining the meaning and scope of the claims and hence is available as a reference in establishing the extent of protection carved out by the patent. *In re Vogel,* 422 F.2d 438, 441 (C.C.P.A. 1970). Where the claim language on its face admits of only one interpretation, as for example, the product claim of the '851 patent, it is unnecessary to refer to the specification to ascertain the meaning of the claim. However, where the claim language is unclear, ambiguous, or is otherwise susceptible to differing interpretations as to the scope of the conferred statutory monopoly, resort to the specification is appropriate in resolving a defense of double patenting.

■ After the scope of the monopoly of each patent is defined by fixing the perimeters of the relevant claims, the Court must then determine whether double patenting exists. The difficulty presented by the chemical subject matter of these particular patents is exacerbated by the dearth of product-process double patenting cases. One may glean from the existing cases, however, that the Court's analysis in this context necessitates the same two-part inquiry applied routinely in other types of double patenting cases. First, the Court must determine whether the claims in question represent the same inventive concept. *See, e.g., In re Taylor,* 360 F.2d 232, 234 (C.C.P.A.1966). If they do not, the Court must then consider whether one patent reflects merely an obvious variation of the other and vice versa. *In re Lyons,* 364 F.2d 1005 (C.C.P.A.1966).

■ The first prong of the double patenting test, commonly referred to as "same invention" double patenting, is derived from the express language of the Patent Act. 35 U.S.C. § 101 provides: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain *a* patent therefor, subject to the conditions and requirements of this title." *Id.* (emphasis added). This section prohibits the granting of more than one patent on a single inventive concept, and may be invoked as a basis for invalidating a patent where the invention is already protected by another patent to the same inventor. *See, e.g., In re Vogel,* 422 F.2d 438, 441 (C.C.P.A.1970) (comparison of process patents); *In re White,* 405 F.2d 904, 906 (C.C.P.A.1969) (comparison of process patents); *In re Boylan,* 392 F.2d 1017, 1021 (C.C.P.A.1968) (comparison of composition claim and method for using composition). The ultimate question in a same invention double patenting inquiry is whether the identical subject matter [29] is

---

**29.** The phrase "identical subject matter" is not used to refer to statutory class. Double patenting may exist although the patents cover different subject matter in the sense that they represent different statutory categorizations. For example, a 35 U.S.C. § 101 utility patent protecting the mechanical structure and function of an invention may be invalid for double patenting in light of a design patent, which has its statutory base in 35 U.S.C. § 171 and concerns the ornamental or aesthetic features of a design.

*See, e.g., Carman Industries,* 724 F.2d at 938–39; *In re Thorington,* 418 F.2d 528, 536 (C.C.P.A. 1969), *cert. denied,* 397 U.S. 1038, 90 S.Ct. 1356, 25 L.Ed.2d 649 (1970); *In re Phelan,* 205 F.2d 183, 184 (C.C.P.A.1953); *see also In re Freeman,* 166 F.2d 178, 180 (C.C.P.A.1948) (where product was defined in terms of its method of production, fact that product claim was in different statutory class from method claim was not, in itself, enough to avoid double patenting rejection).

claimed in both patents. *See, e.g., Carman Industries, Inc. v. Wahl*, 724 F.2d at 940 (in same invention double patenting, the test is whether the patents "claim the same subject matter"); *In re Vogel*, 422 F.2d at 441 ("[b]y 'same invention' we mean identical subject matter; ... same invention means identically same invention"); *In re White*, 405 F.2d at 906 (a same invention double patenting analysis "requires a factual inquiry into whether the claims ... are directed to the *same* subject matter, or invention.... If there be any *substantive* difference, and not merely a difference in language, then the inventions are not the same no matter how small or how obvious those differences may be").

In the context of product and process patents, the United States Supreme Court held early on that where both a process and the resulting product were new, both were patentable. *Rubber Co. v. Goodyear*, 76 U.S. (9 Wall) 788, 796, 19 L.Ed. 566 (1870). The Court there recognized: "[t]he patentability, or the issuing of a patent as to one, in nowise affects the rights of the inventor or discoverer in respect to the other. They are wholly disconnected and independent facts." *Id.* *But see Mosler Safe & Lock Co. v. Mosler*, 127 U.S. 354, 361, 8 S.Ct. 1148, 1151, 32 L.Ed. 182 (1888) ("[a]fter a patent is granted for an article described as made by causing it to pass through a certain method of operation to produce it, ... the inventor cannot afterwards, on an independent application, secure a patent for the method or process").

 The seemingly bright line drawn by the Supreme Court in *Goodyear* has grown dim over time. The Court of Appeals for the Federal Circuit has not yet had an opportunity to speak on the double patenting issue with respect to product and process patents. In the Court of Customs and Patent Appeals, whose decisions are binding as precedent for the Federal Circuit, *South Corp. v. United States*, 690 F.2d 1368 (Fed.Cir.1982), the issuance of

two patents for a process and its resulting product has been neither routinely permitted nor categorically prohibited. Instead, a conceptual approach has been applied to determine whether the two patents, when properly construed, each represent new and different subject matter. For example, in *In re Freeman*, 166 F.2d 178 (C.C.P.A. 1948), the applicant had already patented an extraction process for use in the manufacture of paint compositions. In a separate application, the inventor sought protection of the paint composition itself, defined not by any unique properties, but by its process of manufacture. *Id.* at 179. Although the Court acknowledged that the scope of the process limitations differed with respect to the two claims, it nevertheless denied the composition claim on the ground of double patenting. The Court reasoned that the claim to the paint compositions did not disclose any new matter, the "[f]ormulation of paints [being], of course, conventional" and the claims not alleging any new properties inherent in the composition. *Id.* at 181.

Within the overlay of its conceptual approach, the Court of Customs and Patent Appeals has, in some instances, applied a test to facilitate its determination of whether product and process patents claim the same invention. According to that test, a charge of double patenting will not be sustained if the product can be made by processes other than that secured by the issued process patent *or* the process can produce other products not protected by the product claim. *See In re Taylor*, 360 F.2d 232, 235–36 (C.C.P.A.1966) (process of making collagen film not same invention as product of film itself); *In re Cady*, 77 F.2d 106, 109 (C.C.P.A.1935) (process of manufacturing roofing material not same invention as that of roofing composition); *see also* 1 Horwitz, *Patent Office Rules and Practice* § 79.12. This approach parallels the "cross-reading" test [30] applied in other areas of double patenting and adopted by

---

**30.** According to the cross-reading test, there is no double patenting if either of the claims could be literally infringed without literally infringing

the other. *Carman Industries,* 724 F.2d at 939; *In re Vogel,* 422 F.2d at 441.

the Federal Circuit in the context of design versus utility patents. *See Carman Industries*, 724 F.2d at 940; *see also In re Vogel*, 422 F.2d 438, 441 (C.C.P.A.1970) (similar process claims subjected to cross-reading test of double patenting). The application of the cross-reading test in other types of double patenting cases is at least some indication that the Court of Appeals for the Federal Circuit will follow a like approach in evaluating same invention, product-process double patenting.

▮▮▮▮▮ Obvious-type double patenting similarly involves a reciprocal analysis. Double patenting will be established on the basis of obviousness only if *each* patent is obvious from the other. *See Carman Industries*, 724 F.2d at 940 (design patent relating to external surfaces of storage bins not obvious from utility patent on interior construction); *In re Vogel*, 422 F.2d at 442 (method for packaging beef not an obvious variation of method for packaging pork). Unlike the question of "same invention" the doctrine of "obviousness" in the context of double patenting has no statutory basis. Rather, it is a judicially created doctrine intended to prevent the extension of monopoly to claims in a second patent not "patentably distinct" from claims of the first patent. *In re Thorington*, 418 F.2d at 537; *see also Carman Industries*, 724 F.2d at 940. Under obvious-type double patenting, the claims in question may not be considered prior art with respect to each other.[31] *In re Braithwaite*, 379 F.2d 594, 600 & n. 4 (C.C.P.A.1967). They must, however, be analyzed to determine whether one is obvious from the other in light of all other existing prior art. *Id.* Patents

which are obvious from one another will not be deemed invalid if one contains a terminal disclaimer[32] to ensure that both patents will expire at the same time. *In re Vogel*, 422 F.2d at 442; *In re White*, 405 F.2d at 906.

## The Phillips Patents

Turning to the patents in question, the Court must first scrutinize the language of the claims to ascertain the scope of the monopoly obtained. The meaning of the sole claim of the '851 patent is clear on its face. The claim is for a product defined in terms of its properties—a product that is 1) normally solid polypropylene; 2) consisting essentially of recurring propylene units; and 3) having a substantial crystalline polypropylene content.[33] A product would not fall within the confines of the claim unless all three characteristics were present. The patent provides a monopoly on the product per se, and is not limited to the product as produced by any particular method.

The meaning of claim 16 is less readily apparent. On the surface, that claim sets forth a particular polymerization process containing several critical limitations—the process "comprises," or in other words, includes,[34] the polymerization of propylene at a given temperature with a particular catalyst. The claim also indicates that performance of the process will yield "a resulting solid polymer."[35]

No precise description of that solid polymer is contained in the claim. Movants do not seriously contest that the term "solid" may be used to describe a substance that is either crystalline or amorphous in nature.[36]

---

**31.** In this respect, obvious type double patenting is different from "obviousness" in the sense of 35 U.S.C. § 103. *See In re Braithwaite*, 379 F.2d 594, 600 n. 4 (C.C.P.A.1967).

**32.** The authority for restricting the duration of a patent is provided in 35 U.S.C. § 253. That section states, in pertinent part: "any patentee or applicant may disclaim or dedicate to the public the entire term, or any terminal part of the term, of the patent granted or to be granted." A terminal disclaimer operates to limit the terminal date of a subsequent patent so that it is

coterminous with a prior patent. *See, e.g., In re Dubois*, 262 F.2d 88 (C.C.P.A.1958).

**33.** *See supra* p. 559 for the full text of the claim.

**34.** *See infra* p. 565 regarding the usage of "comprises" in a patent claim.

**35.** *See supra* p. 560 for the full text of claim 16.

**36.** Solid is defined as "A substance of definite shape, and relatively great density, lower internal heat content, greater cohesion of its mole-

However, they assert that in this context, the solid polymer recovered by the process of claim 16 connotes solid crystalline polypropylene, identical in every respect to the product described in the single claim of the '851 patent. In support of their theory, movants rely on a portion of the specification which defines the term "solid" as it is used in connection with the polymerization of propylene.[37] That passage refers to a process of "fractionation,"[38] which, when performed on the total polymer produced by the process set forth in claim 16, would enable one skilled in the art to isolate from the total substance a tacky polymer and a high molecular weight solid polymer. Movants emphasize that the specification expressly defines the term "solid" as this high molecular weight substance obtained *after* fractionation. Thus, in interpreting claim 16, movants would, in effect, read an additional process step—fractionation—into the phrase "and recovering a resulting solid polymer."

Extending their analysis a step further, movants point to language in the specifica-

tion which describes this high molecular weight, fractionated solid in sufficient detail that the skilled polymer chemist would recognize the disclosure of a crystalline substance.[39] Movants highlight the identical language in the 1953 application which Phillips' successfully relied upon to establish its constructive reduction to practice of crystalline polypropylene in its suit for priority of invention over Montedison. *See Standard Oil,* 494 F.Supp. at 421.[40] Thus, movants contend that claim 16, read in light of the patent specification, claims a process for the production of a particular substance, and claims the fractionation of that substance to yield solid crystalline polypropylene as described in the '851 patent. That conclusion forms the linchpin on which movants' double patenting challenge is based.

Phillips, on the other hand, eschews this interpretation of the claim. Although Phillips concedes that the '721 patent, read in its entirety, provides all the data needed to produce solid crystalline polypropylene from the process of claim 16,[41] Phillips

cules. It may be homogenous (as crystals and solid solutions); or heterogeneous (as amorphous and colloidal substances). It differs from the liquid or gaseous state by reason of its slower molecular motions." *Hackh's Chemical Dictionary* 786 (3d ed. 1944).

37. Column 2, lines 32–45 of the '721 patent (D.I. 46, exh. 6) defines "solid polymer" in the context of the polymerization of propylene:

Throughout the specification, it is to be understood that the term "total polymer" as applied to polymers of propylene, designates all polymer boiling above the monomer (but not including any diluent, of course); the semi-solid polymer constitutes the mixture or residuum remaining after distilling off, or otherwise removing, the light oil boiling below about 900° F.; the tacky polymer is the lower molecular weight portion of the semi-solid polymer, which portion can be extracted therefrom with n-pentane at room temperature; *and the solid polymer is the higher molecular weight portion of the semi-solid fraction, which constitutes the raffinate or insoluble portion left from the extraction with n-pentane or methylisobutylketone (MIBK).*

*Id.* (emphasis added).

38. *See supra* note 6 for the definition of fractionation.

39. Movants quote from column 27, lines 26–28 of the patent, which states that the solid polymer fraction of polypropylene that is insoluble in pentane at room temperature has a "melting point in the range of 240 to 300° F." D.I. 46, exh. 6 at col. 27, lines 26–28.

40. Phillips argued before Judge Wright that the disclosure of a substance's high melting point would be understood by one skilled in the art to indicate that the substance was crystalline even though no specific mention of crystallinity was made. 494 F.Supp. at 420–21.

41. In opposition to the summary judgment motion, Phillips filed an affidavit by William J. Bailey, a chemistry professor at the University of Maryland. Bailey stated in his affidavit that a skilled polymer chemist would not know that the process of claim 16 could be used in the preparation of solid crystalline polypropylene. Phillips conceded at oral argument that Bailey's statement was premised upon consideration of only the language of claim 16, without reference to the patent specification. His opinion therefore turned on the omission of fractionation from the text of claim 16. Phillips additionally conceded that if the specification could be used as a reference, one would know that solid crystalline polypropylene could be produced by claim 16's process if fractionation was applied.

denies that the claim itself states a process directed solely to the manufacture of solid crystalline polypropylene. Phillips steers the Court's attention away from the patent specification and back to the language of the claim, emphasizing the obvious omission of fractionation. All parties agree, unless the product produced by the specified process steps of the claim were subjected to the added step of fractionation, solid crystalline polypropylene would never be recovered. Consequently, Phillips maintains that the absence of fractionation from the wording of the claim vitiates movants' assertion that Phillips has previously obtained a monopoly on a process which, if followed, would inevitably yield the product, solid crystalline polypropylene.

In addition, Phillips observes that claim 16 denotes a process "comprising" the polymerization of propylene. Phillips urges that use of the word "comprises" permits the addition of other monomers in conjunction with propylene as feed to the process and therefore establishes that the process of claim 16 is not directed solely to preparation of the product of the '851 patent.

The differences in the parties' interpretations of the claims must be resolved before the Court can compare the patents to determine if double patenting exists. Careful consideration of the claim language and the patent specification in light of the arguments presented compels a finding that movants have misinterpreted the scope of patent protection afforded by claim 16. That provision undisputedly asserts a claim to a process per se. As such, it secures a monopoly for the production of a solid polymer by means of specified process steps. That monopoly cannot be expanded to include additional process steps found in the specification but not expressly claimed.

Thus, fractionation cannot be read into the language of claim 16 to become part of the patent monopoly. Moreover, the scope of claim 16's monopoly, limited in terms of the catalyst used and the temperature at which the process is performed, is not restricted by the properties of the product produced, beyond the fact that the product must be a solid polymer and must contain propylene. Movants in effect ask the Court to search the patent specification for evidence of additional properties inherent in the product resulting from claim 16's process, and then argue that those properties—in this case crystallinity and the recurrence of propylene units—should be read as limitations upon the scope of the monopoly. Claim 16 is not, however, so limited. Its concern is with the acquisition of a patent on a particular process, rather than with the specifics of the product produced. Consequently, claim 16 may not be read as limited to a process for the manufacture of solid crystalline polypropylene consisting essentially of recurring propylene units. Indeed, the process claim would equally protect against the manufacture of a product lacking these specific qualities but produced by the process of claim 16 including propylene as feed to the process.

Moreover, because the process claim uses the word "comprises," it does not purport to limit its protection to a process using only propylene as feed. *See, e.g., In re Fenton,* 451 F.2d 640, 642 (C.C.P.A.1971); *In re Cone,* 121 F.2d 470, 472 (C.C.P.A.1941). Rather, claim 16 contemplates that the process described could be performed on propylene in combination with other substances, as long as a solid containing propylene was ultimately produced.[42] Indeed, the specification makes

---

Any issue of fact which initially appeared to be created by the Bailey affidavit was thus eliminated at oral argument. *See* D.I. 95 at 127–29.

**42.** Movants oppose this construction of claim 16 for two reasons, neither of which is persuasive. First, they urge that use of the term "comprises" does not allow for the inclusion of elements that would "alter the purpose of the process and thus lead to a different result from that contemplated

by the claim." D.I. 79 at 15. Second, they argue that the claim may not be interpreted to permit the addition of unspecified substances if the claim would then be duplicative of another claim in the same patent. *Id.* at 16–17.

Assuming, *arguendo,* the correctness of movants' legal precepts, their application to the instant case fails to produce the suggested result. Movants' first argument rests on the assumption that the purpose of claim 16 is to produce solid

express reference to the polymerization of propylene in conjunction with other monomers.[43] It is therefore evident that the monopoly carved out by the claim encompasses the polymerization of propylene through the process described, as well as the polymerization of propylene by that same process in combination with other monomers.

■ Having analyzed the language of the claims, there remains the question of whether double patenting exists, either because the claims represent the same invention or because one is an obvious variation of the other. With respect to same invention double patenting, I do not profess to determine whether a conceptual approach or the cross-reading test stands as the better mode of analysis. Each has its advantage for the courts and prospective litigants, the former being more adaptable to factual variances and the latter facilitating predictability of result. For purposes of this case either approach yields the same result—claim 16 of the '721 patent and the

single claim of the '851 patent are directed to different inventions.

First, claim 16 pertains to a process, whereas the '851 patent applies to a product per se. Each provides a presumptively valid assertion that the subject matter claimed is novel, useful and nonobvious. As such, the two claims represent different, though related contributions to the field of polymer chemistry. The process claim indicates one of many uses of Phillips' chromium oxide catalyst in the polymerization process. The composition of that catalyst was itself the subject of several claims in the '721 patent. The '721 patent also contains a series of process claims, claim 16 among them, elucidating use of a specific catalyst in the polymerization of a multitude of olefins.[44] Some of the polymers produced by those claims were themselves alleged to be novel[45] while others were not. But the novelty of the product resulting from the process of each claim was not the primary concern of the patent office. The claims were allowed because of the novelty of the chromium oxide catalyst essential to the processes.[46] Similarly,

---

crystalline polypropylene consisting essentially of recurring propylene units and having a substantial polypropylene content. As has already been determined, claim 16 is not so limited. Rather, the claim is a *process* claim, the purpose of which is to produce, by the method presented, a solid polymer containing propylene.

Nor is the inclusion of additional substances in the process of claim 16 precluded by other claims in the patent. The patent does contain general claims to the polymerization of any number of unspecified olefins, *see* claims 1–11, and specifically claims the copolymerization of propylene and ethylene, *see* claim 17. Claim 16 is, however, the only claim to a polymerization process which must include propylene, either alone or in combination with other substances. This overlapping of general and more specific claims to related subject matter in the same patent is not impermissible. *See In re Braithwaite*, 379 F.2d 594, 601 (C.C.P.A.1967).

**43.** The patent disclosure states: "[A]ccording to this invention, special benefits can be obtained by utilizing, as feed to the process, a mixture of *at least* two different olefins. For example, ethylene and propylene can be copolymerized, as can ethylene and 1-butene, 1-butene and propylene or propylene and a pentene, in the presence of a chromium oxide polymerization catalyst." D.I. 46, exh. 6 at 544, col. 9, lines 55–61 (emphasis added).

**44.** It has been held that a chemical catalyst and the use of that catalyst in a chemical process are the same invention. *See* Studiengesellschaft *Kohle v. Eastman Kodak Co.*, 450 F.Supp. 1211, 1227 (E.D.Tex.1977), *aff'd in part and rev'd in part*, 616 F.2d 1315 (5th Cir.), *cert. denied*, 449 U.S. 1014, 101 S.Ct. 573, 66 L.Ed.2d 473 (1980). If that be so, then Phillips correctly included the process claims in its patent for the composition of the catalyst itself. The invention of substances which can be made from the catalytic process, such as polypropylene and poly(4-methyl-1-pentene), seems properly to belong in separate product patents.

**45.** For example, a patent on the invention of solid polymers of 4-methyl-1-pentene, issued to Phillips' assignors on August 3, 1982. One process for making poly(4-methyl-1-pentene), though not the only process, was disclosed in the '721 application. The Patent Office Board of Appeals upheld the validity of that product patent against a challenge for double patenting. *See* Ex Parte Hogan, Appeal No. 436–63 (Bd. of Pat.App. Mar. 30, 1981), discussed *supra* note 23.

**46.** Significantly, claim 15 of the '721 patent states a process for polymerizing ethylene in terms similar to claim 16, except for the difference in feed for the process and use of the

Claim 16, represents one use of Phillips' new chromium oxide catalyst in a polymerization process. It does not purport to claim the different inventive concept of the product of the '851 claim.

Moreover, claim 16 does not state a process for the manufacture of solid crystalline polypropylene as defined in the '851 patent because it lacks any mention of fractionation. There is therefore missing the "identity of subject matter" between the patents which is essential to a finding of same invention double patenting. *See In re Vogel*, 422 F.2d at 441; *In re White*, 405 F.2d at 906.

Phillips' patents likewise survive analysis under the cross-reading test of double patenting—the product of the '851 patent may be made by other processes and the process of claim 16 may be used to make other products. First, claim 16 as interpreted by the Court, results in a product other than the solid crystalline polypropylene of the '851 patent. Only by subjecting that product to fractionation, will solid crystalline polypropylene be recovered.[47] Conversely, the product of the '851 patent may be made by a significantly different pro-cess—the organometallic process which has been patented by Montedison and which was disclosed in the '851 specification.[48]

Movants challenge the propriety of considering the organometallic process in the double patenting analysis since that process was invented *after* Phillips' development in 1953 of solid crystalline polypropylene. *See Standard Oil, supra.* Indeed, since Phillips relied on the date of its 1953 application to obtain priority of invention and secure the '851 patent, movants maintain that the double patenting inquiry should be limited to the 1953 date. Neither the movants, in presenting this argument, nor Phillips in rebutting it, have cited any compelling authority to support their respective positions.[49] Nor has the Court's independent research disclosed any case law expressly on point. Movants strenuously argue that the purpose of the double patenting inquiry militates against consideration of the organometallic process. They urge that since the question is whether the patents represent the same or different inventive concepts, the focus should be restricted to the established date of invention—in this case 1953. Movants maintain

---

phrase "recovering a solid polymer" instead of "recovering a *resulting* solid polymer" (emphasis added). The polyethylene produced by the process of claim 15 was not itself new to the art and was not separately patented. *See* Bailey Affidavit at 3, ¶ 7. Claim 15 is patentable, however, as a *process* claim, because the chromium oxide catalyst was new to the art of polymerizing ethylene. Claim 15 does not claim the *product* of polyethylene; it merely states a process whereby polyethylene can be made.

**47.** The process of claim 16 may also be used to prepare products other than solid crystalline polypropylene, if other monomers are included with propylene as feed to the process. *See supra* pp. 565–66.

**48.** In like vein, it appears from the specification of the '721 patent that solid crystalline polypropylene may also be made with a chromium oxide catalyst supported on either silica or alumina alone. *See* Phillips' '721 patent, col. 14, Table VII and col. 5, lines 18–24. (D.I. 46, exh. 6). In contrast, claim 16 calls for a catalyst supported on silica-alumina.

**49.** Phillips has brought several cases to the Court's attention in connection with this issue, which apparently take note of developments in the art arising after the time of invention of the patented subject matter in resolving a double patenting challenge. *See Hope Basket Co. v. Product Advancement Corp.,* 187 F.2d 1008 (6th Cir.1951), *cert. denied,* 342 U.S. 833, 72 S.Ct. 44, 96 L.Ed. 630 (1951); *Schute v. Hildreth,* 8 F.2d 131 (3d Cir.1925); *Jacquard Knitting Machine Co. v. Ordnance Gauge Co.,* 95 F.Supp. 902 (E.D. Pa.1951). In none of these cases, however, does it appear that any objection was raised to the courts' consideration of subsequent improvements in the art. The cases are therefore of minimal value in resolving the issue before me, except as evidence that some courts have applied without question the rule that Phillips seeks to have this Court adopt. In Ex Parte Hogan, *supra,* the Board of Patent Appeals was asked to determine whether a later-disclosed process could be considered in defeating a double patenting challenge. The Board deemed such subsequent developments in the art relevant to the double patenting inquiry. *See Hogan,* No. 436–63, slip op. at 5. Although that decision is of no precedential value, it does illustrate the procedure which the Board of Patent Appeals, with its particular expertise, deems appropriate.

that the organometallic process may not be considered for double patenting purposes because, while known and even mentioned in the '851 specification, it was not known at the time the 1953 application was filed.

While movants' argument contains superficial appeal, closer examination reveals its flaws. First, it inappropriately weds priority of invention with the double patenting doctrine. The purpose of the former is to determine who, among potential inventors, is considered first for purposes of United States patent law. The primary, albeit not the only purpose of the latter doctrine is to prevent the claim of like subject matter in more than one patent.

Second, consideration of subsequent advancements in the art in the double patenting analysis neither expands nor contracts the scope of the invention claimed. It merely serves as an aid in determining whether the whole of the inventor's contribution to the art was deserving of one or more than one patent. In this respect, inclusion of a later developed process complements the policy underlying the patent statute. It is a goal of that act to encourage continual innovation by conferring upon the inventor a statutory monopoly with its potential for economic gain. To achieve that goal, it is important that the inventor receive protection to the full extent of his or her invention. If one patent is sufficient to ensure that protection, double patenting steps in to prohibit the issuance or retention of a second patent to the same inventor. If, on the other hand, a single patent leaves a related invention unclaimed and therefore unprotected, a second patent may be in order.[50] Thus, the cross-reading test of double patenting serves as one means by which a court can determine whether a single patent has already provided the protection due, rendering a second patent superfluous. To that end, it would be logical to consider even a later developed process to ascertain whether one patent, standing alone, provides all the protection that the inventor is entitled to.

■ Third, the peculiar sequence of events in this case has resulted in the issuance to Phillips of a product patent which discloses a process undeveloped and unknown to it at the time the initial application was filed. Once known, Phillips correctly disclosed but did not claim the organometallic process as a process for making solid crystalline polypropylene. It would be anomalous in a double patenting inquiry to ignore a process which is disclosed in the very patent being examined by the Court. The Court declines to conduct the double patenting analysis with blinders so as to avoid recognition or discourage disclosure of advances in process technology as a means of making a product patent. I therefore conclude that on these facts, it is appropriate to consider the organometallic process which stands as an alternative, albeit a subsequent, means of preparing the product of the '851 patent. Because this alternative process should be considered in this double patenting inquiry, no same invention double patenting exists.

Attention is now turned to the question of whether claim 16 of the '721 patent and the sole claim of the '851 patent constitute "obvious" type double patenting. The test is whether the subject matter of the claim of the '851 product patent "would have been obvious" from claim 16 of the '721 process patent, and vice versa. See Carman Industries, Inc. v. Wahl, 724 F.2d at 940. There is no basis in this record for a conclusion that the product of the '851 patent, exhibiting a structure of recurring molecules of propylene and having the properties of solidity and crystallinity, would have been obvious to one skilled in the art given only the claim 16 process. As has been stated previously, the polymeriza-

---

**50.** This assumes, of course, that the patent does not otherwise fail for double patenting, such as because one patent is obvious from the other.

See the discussion of obvious-type double patenting, supra at 563.

tion of propylene had, prior to Phillips' invention, only been known to produce an amorphous, rather than a crystalline substance. Moreover, it would be necessary that the product obtained by the process of claim 16 be fractionated before solid crystalline polypropylene would be obtained.

Equally important, movants have not, and cannot, make a showing that the process for making polypropylene would have been obvious from the claim of the '851 patent.[51] Movants do not contend, and no record support has been cited for the proposition, that the process of claim 16 could be ferreted out merely from knowledge of the product of the '851 patent. I am therefore not persuaded that the '851 patent should fail under the test for obvious type double patenting.

### Conclusion

The prolonged litigation over the rights to a product patent on polypropylene has worked a rather curious anomaly in the field of polymer chemistry. The patent on Phillips' chromium oxide catalyst, which may be used but has never achieved commercial success in the production of crystalline polypropylene, has long since expired.[52] Moreover, royalties on the product of polypropylene were paid to Montedison until 1980.[53] Phillips may now continue to exact royalties for that same product until the expiration of its '851 patent. Nonetheless, the delays in determining the rightful inventor of polypropylene do not justify depriving Phillips of the fruits of its invention. Accordingly, an order will be entered in this matter denying movants' Motion for Summary Judgment predicated on double patenting.

---

**51.** On first blush, it appears peculiar to consider whether the earlier issued process patent is obvious from the subsequently issued product patent. However, when two patents issue with respect to different statutory categorizations as a result of co-pending applications, it is irrelevant which patent issues first. In that case, each patent must be obvious from the other before they would succumb to an obvious type double patenting challenge. *Cf. Carman Industries, Inc. v. Wahl,* 724 F.2d at 940.

---

**52.** The 17-year term of the '721 patent ended in 1975.

**53.** As a result of Interference No. 89,634, Montedison received a patent on polypropylene in 1973. It was not until 1980 that the validity of that patent was overturned. *See Standard Oil,* 494 F.Supp. at 456.